# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-1936

_____

United States of America

*Plaintiff - Appellee*

v.

Christopher Kobe Rainbow

*Defendant - Appellant*

_____

No. 15-1937

_____

United States of America

*Plaintiff - Appellee*

v.

Jordan Rainbow

*Defendant - Appellant*

_____

Appeals from United States District Court
for the District of North Dakota - Bismarck

_____

Submitted: December 17, 2015
Filed: February 19, 2016

_____

Before WOLLMAN, BRIGHT, and LOKEN, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Christopher Rainbow (Christopher) and Jordan Rainbow (Jordan) were found guilty of assault with a dangerous weapon and assault resulting in serious bodily injury, both in violation of 18 U.S.C. §§ 2, 113, and 1153. On appeal, they argue that the district court[1] erred in admitting into evidence certifications of Indian blood and in denying their requests to instruct the jury on lesser-included offenses. Jordan also argues that the district court erred in asking certain questions of a doctor who treated the victim and that the evidence is insufficient to support his convictions. We affirm.

## I. Background

Late in the evening on April 20, 2014, two groups of friends gathered at the Diamond Z bar in Fort Yates, North Dakota. Sophia Bear Stops (Sophia) went to the bar with her cousins, Robyn Weddell (Robyn), Cheyenne Weddell (Cheyenne), and Robert Weddell (Robert). While there, they spoke to Jordan, Christopher, and Christopher's wife, Angelica Rainbow (Angelica). When the bar closed, they decided to go to Robyn's trailer to continue drinking alcohol. Robyn bought a bottle of rum and Christopher, Jordan, and Angelica bought a bottle of tequila. The two groups drove separately to the trailer, where they sat in their cars, talked, listened to music, and passed around the bottles of alcohol.

_____

[1]The Honorable Daniel L. Hovland, United States District Judge for the District of North Dakota.

All was apparently going well until Ethan Agard (Ethan) arrived and walked over to Cheyenne and Robert. Ethan was intoxicated, slurring his speech and stumbling. Christopher exited his vehicle and approached Ethan. The two began fighting almost immediately, and Ethan was soon on the ground. Cheyenne and Robert testified that when they tried to break up the fight, they instead scuffled with Christopher and Jordan. Christopher soon ran across the street and pulled a metal downspout off a building.

Cheyenne ran away when he saw Christopher coming toward him with the downspout. Cheyenne hid in the weeds behind the trailer, and although he could not see what happened next, he heard Sophia screaming. In the meantime, Robert was struck with the downspout and started running down the street. When he turned and looked back toward the trailer, he saw Christopher strike Sophia in the face with the downspout.

According to Robyn, she and Angelica stood on the street while the men fought. Robyn saw Christopher run across the street and pull down the downspout. Thereafter, Robyn ran to the back of her trailer, where she did not go inside but instead returned to help the screaming Sophia.

Sophia testified that after Christopher saw her standing by the side of the trailer, she froze. Christopher ran toward her, holding the downspout with both hands. He struck Sophia in the face with the downspout, causing her to fall to the ground. Sophia then saw Christopher standing above her and Jordan running toward her. She heard Christopher say, "Let's kill this little bitch," whereupon both Christopher and Jordan began beating her. When she began screaming for help, they told her to shut up and continued to hit her. Sophia believed that Jordan had something in his hand, but she was unable to tell what it was as she tried to block her face and body from the blows. Sophia testified that she could feel "multiple hits at a time" and that she "kn[ew] it was not coming from just one person."

Robyn testified that she saw Christopher and Jordan hitting Sophia. "Chris had that white drain pipe, and I just seen Jordan hitting her. I don't know if he had a weapon or not. I just seen them both really hitting her, and she was just screaming my name." Eventually, Robyn was able to move the blood-covered Sophia to safety. Robyn, Cheyenne, and another person placed Sophia in the back of Cheyenne's vehicle, which was covered with glass from a shattered windshield.

Angelica had a different recollection of the assault. According to her, as Christopher and Jordan were leaving, Cheyenne tackled Christopher from behind. Jordan tried to intervene, but was attacked by Robert and Ethan, with Robyn joining in the fight. Sophia had grabbed Angelica's hair and called for Robyn, saying, "Bobby, let's get this bitch." Sophia and Angelica fell to the ground, whereupon Robyn ran over and kicked Sophia in the head three times. Angelica testified that Robyn looked surprised when she realized that she had kicked Sophia—not Angelica—and that Robyn then threatened to kick Angelica. By then, according to Angelica, the men had stopped fighting. Angelica testified that Christopher and Jordan did not hit or otherwise injure Sophia and that Sophia's injuries were caused by Robyn.

Sophia was later transported by ambulance to a hospital in Bismarck, North Dakota, where she was treated in an emergency room during the early morning hours of April 21, 2014. Her face was cut, she was badly bruised, and she complained of abdominal and back pain. The lacerations on her face required nineteen stitches: four on her lip, six on her nose, and nine on her left nostril. In the days that followed, Sophia experienced severe pain and remained in bed for more than one week.

Christopher and Jordan were charged with assault with intent to commit murder, assault with a dangerous weapon, and assault resulting in serious bodily injury. Each count charged that Christopher and Jordan "individually, and by aiding and abetting, did assault Sophi[a] Bear Stops." For conviction on any of the counts,

the government was required to prove that Christopher and Jordan were Indians and that the offense occurred within Indian country. See 18 U.S.C. § 1153.

The emergency room doctor who treated Sophia testified that he had diagnosed Sophia with a closed-head injury, which he described as "some trauma -- blunt trauma, that the person was hit in the head or the face." His notes indicated that "[r]eportedly she was assaulted and hit with a solid object in the face." At the close of the doctor's testimony, the district court asked him whether Sophia's injuries were consistent with being struck with a solid object in the face and whether his testimony was based upon a reasonable degree of medical certainty. The doctor replied yes to both questions. Thereafter, defense counsel objected and moved for a mistrial, arguing that the court had solicited inappropriate expert testimony. The district court overruled the objection and denied the motion, stating, "The medical records reflected that she had been struck with a solid object in the face. I simply wanted to know whether his examination was consistent with that information."

To establish that Christopher and Jordan were Indians and that the offense occurred within Indian country, the government called Dwight Archambault, who is employed by the Standing Rock Agency of the Bureau of Indian Affairs (BIA) as the deputy superintendent for trust services. Archambault testified that Christopher and Jordan were enrolled members of the Standing Rock Sioux Tribe. For enrollment, the tribe requires that a person have enrolled parents and have "one-fourth Standing Rock blood." Archambault explained that his office certifies blood quantum and presents enrollment records to the tribe. The tribe then decides whether to enroll the individual. Archambault's office maintains records of tribal enrollment and of each member's blood quantum.

Archambault testified that he instructed an enrollment clerk to prepare two certificates, one for Christopher and one for Jordan. The certificates were entitled "Certified Degree of Indian Blood" and listed Christopher's and Jordan's names,

dates of birth, tribal enrollment numbers, and total Sioux blood quantum. The enrollment clerk who prepared the documents signed her name below the statement, "I hereby certify that the above named individual is an enrolled member of the Standing Rock Sioux Tribe." Archambault testified that the records the enrollment clerk used to create the certificates were kept by his office in the ordinary course of business, that he had access to those records on a day-to-day basis, and that he could look up the enrollment status of an individual at any given time. He explained that, although an enrollment clerk prepared Christopher's and Jordan's certificates, Archambault could have done so himself. The district court overruled Christopher's and Jordan's objection to the admission of the certificates.

Before the case was submitted to the jury, Christopher and Jordan requested lesser-included-offense instructions. Christopher argued that Angelica's testimony established that Robyn caused Sophia's injuries. Jordan argued that the testimony did not establish that he had a weapon and that the evidence supported an inference that he had played only a minor role, if indeed he had been involved at all. The district court denied the requests, stating:

> [T]here is no basis in the record . . . to justify the issuance of any lesser-included offenses on any of the three counts . . . . The gist of the defense is that [Christopher and Jordan] were not involved in any assault whatsoever on Sophia Bear Stops, and I would be hard pressed to have an instruction on the lesser-included offense based on that state of the record.

The district court instructed the jury that to find Christopher and Jordan guilty of any of the alleged crimes, it had to find that each defendant was "an Indian/Native American." The instructions defined "Indian" as a person who "has some Indian blood" and "is recognized as an Indian by an Indian tribe and/or the federal government." The district court also gave an aiding-and-abetting instruction, stating that "[a] person may also be found guilty . . . even if he personally did not do every

-6-

act constituting the offense charged, if he aided and abetted the commission of the offense."

The jury found that Christopher and Jordan were not guilty of assault with intent to commit murder. It returned guilty verdicts on the remaining two counts, however, finding that both Christopher and Jordan had committed assault with a dangerous weapon and assault resulting in serious bodily injury. The district court sentenced Christopher to 180 months' imprisonment and Jordan to 72 months' imprisonment.

## II. Discussion

### A. Admission of the Certificates of Degree of Indian Blood

Section 1153 confers federal jurisdiction to prosecute certain offenses that are committed by an Indian within Indian country. 18 U.S.C. § 1153(a). The statute does not define the term "Indian," but the test we have applied "asks whether the defendant (1) has some Indian blood, and (2) is recognized as an Indian by a tribe or the federal government or both." United States v. Stymiest, 581 F.3d 759, 762 (8th Cir. 2009) (citing United States v. Rogers, 45 U.S. 567, 572-73 (1846)). Whether a defendant is an Indian "is an element of the crime that must be submitted to and decided by the jury." Id. at 763. During its closing argument, the government cited Archambault's testimony and the certificates of degree of Indian blood as evidence that Christopher and Jordan were Indians.

The BIA has explained that a certificate of degree of Indian blood "certifies that an individual possesses a specified degree of Indian blood of a federally recognized Indian tribe." See Certificate of Degree of Indian or Alaska Native Blood, 65 Fed. Reg. 20775-01 (proposed Apr. 18, 2000). BIA officials issue certificates "so that individuals may establish their eligibility for . . . programs and services based

upon their status as American Indians." Id.; see also Underwood v. Deputy Assistant Sec'y–Indian Affairs, 93 Interior Dec. 13, 23 (1986) (explaining that certificates establish eligibility for programs and services intended for Indians). Archambault explained that there were five people in his office who could certify an individual's degree of Standing Rock Sioux blood: the superintendent; Archambault, who served as the deputy superintendent; and three enrollment clerks. As indicated above, the enrollment clerk who prepared Christopher's and Jordan's certificates did not testify at trial.

Christopher and Jordan argue that the admission of the certificates violated the Confrontation Cause of the Sixth Amendment in light of Crawford v. Washington, 541 U.S. 36 (2004); Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009); and Bullcoming v. New Mexico, 131 S. Ct. 2705 (2011). They contend that the certificates were essentially affidavits that were created to prove an element of each offense, namely, that Christopher and Jordan were Indian. Because the certificates were testimonial, the argument goes, Christopher and Jordan were entitled to confront the enrollment clerk who certified to their blood quantum and tribal enrollment. The government responds that although the certificates were prepared for trial, the information contained therein was kept in the ordinary course of business by the Standing Rock Agency of the BIA. According to the government, the admission of the certificates did not run afoul of the Confrontation Clause because the certificates were non-testimonial business records. We review the district court's Confrontation Clause ruling *de novo*. United States v. Thompson, 686 F.3d 575, 580-81 (8th Cir. 2012).

The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." In Crawford v. Washington, the Supreme Court explained that "witnesses" against the accused are "those who bear testimony" and that "'[t]estimony,' in turn, is typically a solemn declaration or affirmation made for the

purpose of establishing or proving some fact." 541 U.S. at 51 (internal quotation marks and citations omitted). "Where testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." Id. at 68.

In Melendez-Diaz v. Massachusetts, the Supreme Court held that affidavits regarding the chemical composition of a seized substance were "testimonial" and that the laboratory analysts who certified the results were "witnesses" for purposes of the Confrontation Clause. 557 U.S. at 310-11. The Court reasoned that "not only were the affidavits made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial, but under Massachusetts law the *sole purpose* of the affidavits was to provide prima facie evidence of the composition, quality, and the net weight of the analyzed substance." Id. at 311 (internal citations and quotation marks omitted); Bullcoming, 131 S. Ct. at 2717 ("A document created solely for an 'evidentiary purpose,' Melendez-Diaz clarified, made in aid of a police investigation, ranks as testimonial." (quoting Melendez-Diaz, 557 U.S. at 311)). "[I]n Bullcoming v. New Mexico, the Court extended Melendez-Diaz's holding and determined that the person who conducts a laboratory test—not merely a colleague knowledgeable about the testing procedures and equipment used—must be available for cross-examination to satisfy the Sixth Amendment's confrontation requirement." United States v. Williams, 720 F.3d 674, 698 (8th Cir. 2013) (citing Bullcoming, 131 S. Ct. at 2716).

Business records are generally admissible absent confrontation, however, "because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial." Melendez-Diaz, 557 U.S. at 324. The Court in Melendez-Diaz rejected the argument that the analysts' affidavits were akin to business records, comparing them instead to police reports and concluding that they were "calculated for use

essentially in the court, not in the business." Id. at 321 (quoting Palmer v. Hoffman, 318 U.S. 109, 114 (1943)).

We conclude that the admission of the certificates did not violate Christopher's and Jordan's Sixth Amendment rights. Although Archambault testified that he "had [these particular certificates] prepared for [his] testimony," BIA officials regularly certify blood quantum for the purpose of establishing eligibility for federal programs available only to Indians. Archambault explained that his office maintained the records of tribal enrollment and of each member's blood quantum. He could look up an individual's enrollment status and blood quantum at any time—that information existed regardless of whether any crime was committed. Unlike the analysts in Melendez-Diaz and Bullcoming, the enrollment clerk here did not complete forensic testing on evidence seized during a police investigation, but instead performed the ministerial duty of preparing certificates based on information that was kept in the ordinary course of business. An objective witness would not necessarily know that the certificates would be used at a later trial, because certificates of degree of Indian blood are regularly used in the administration of the BIA's affairs. Simply put, the enrollment clerk prepared certificates using records maintained in the ordinary course of business by the Standing Rock Agency, and the BIA routinely issues certificates in the administration of its affairs. Thus, the certificates were admissible as non-testimonial business records. See, e.g., Williams, 720 F.3d at 699 (holding that finger print cards from an arrest in a different jurisdiction were non-testimonial business records); Thompson, 686 F.3d at 581-82 (holding that a state agency's record of the defendant's reported was a non-testimonial business record); United States v. Mashek, 606 F.3d 922, 930 (8th Cir. 2010) (holding that logs of customers' pseudoephedrine purchases were non-testimonial business records).

Moreover, in addition to the certificates, the government elicited testimony from Archambault that Christopher and Jordan were enrolled in the Standing Rock Sioux Tribe. That testimony alone established that Christopher and Jordan were

Indian for purposes of § 1153, for the Standing Rock Sioux Tribe requires its members to have at least "one-fourth Standing Rock blood." See United States v. Diaz, 679 F.3d 1183, 1187 (10th Cir. 2012) ("[M]embership in a tribe that will not accept members without a certain degree of consanguinity, . . . has been held to [prove that a person is an Indian]."); see also United States v. Pemberton, 405 F.3d 656, 660 (8th Cir. 2005) ("Enrollment is the common evidentiary means of establishing Indian status . . . ."(quoting United States v. Broncheau, 597 F.2d 1260, 1263 (9th Cir. 1979)).

## B.  Denial of Lesser-Included-Offense Instructions

Christopher and Jordan argue that the district court abused its discretion by refusing to submit lesser-included-offense instructions to the jury. See United States v. Milk, 281 F.3d 762, 768 (8th Cir. 2002) (standard of review). "[A] defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater." Keeble v. United States, 412 U.S. 205, 208 (1973).  A lesser-included-offense instruction is warranted if:

> (1) a proper request is made; (2) the elements of the lesser offense are identical to part of the elements of the greater offense; (3) there is some evidence which would justify conviction of the lesser offense; (4) the proof on the element or elements differentiating the two crimes is sufficiently in dispute so that the jury may consistently find the defendant innocent of the greater and guilty of the lesser included offense; and (5) there is mutuality, *i.e.*, a charge may be demanded by either the prosecution or the defense.

United States v. Felix, 996 F.2d 203, 207 (8th Cir. 1993) (quoting United States v. One Star, 979 F.2d 1319, 1321 (8th Cir. 1992)).  The dispute in this case centers

around the third requirement, which we have said "is met if the jury could infer from the evidence presented that the defendant committed the lesser offense." Id.

Christopher and Jordan requested an instruction on simple assault, 18 U.S.C. § 113(a)(5), as a lesser-included offense of assault with a dangerous weapon, id. § 113(a)(3). As relevant here, the distinguishing factor between the two offenses is the use of a dangerous weapon, which is required under § 113(a)(3), but not under § 113(a)(5). They also requested an instruction on assault by beating, striking, or wounding, id. § 113(a)(4), as a lesser-included offense of assault resulting in serious bodily injury, id. § 113(a)(6). The distinguishing factor between those two offenses is whether serious bodily injury resulted, which is required under § 113(a)(6), but not under § 113(a)(4).

Christopher argues that the evidence would have permitted the jury rationally to find that he committed simple assault and not assault with a dangerous weapon. He contends that the jury could have found that he merely threatened Sophia and that he did not use the downspout in making the threat. A jury could reach that conclusion, he says, by believing Sophia's testimony that Christopher said, "Let's kill this little bitch," but yet finding that he had not followed through with any physical force nor caused any serious bodily injury, and by believing Angelica's testimony that Christopher did not in any way harm Sophia. In reaching this conclusion, of course, the jury also would have to reject Sophia's, Robyn's, and Robert's testimony that Christopher struck Sophia with the downspout and disregard the physical and photographic evidence of the downspout, which was bent and splattered with blood. In light of this evidence, we conclude that the jury could not rationally find that Christopher committed simple assault but was innocent of assault with a dangerous weapon. See United States v. Sinclair, 444 F.2d 888, 890 (D.C. Cir. 1971) ("[T]here must be some rational basis for the lesser charge; otherwise it is merely a device for defendant to invoke the mercy-dispensing prerogative of the jury, and that is not by itself a permissible basis to require a lesser-included offense instruction." (footnote

-12-

omitted)).  The district court thus did not abuse its discretion by denying the lesser-included-offense instruction.

Christopher maintains that because there was a dispute as to whether he or Robyn caused Sophia's facial lacerations and head injury, the evidence would have permitted the jury rationally to find that he committed assault by beating, striking, or wounding and not assault resulting in serious bodily injury.  Christopher first argues that a jury could find that Robyn caused Sophia's injuries when she kicked Sophia in the head.  If the jury were to find that Robyn kicked Sophia, however, it could not rationally find that Christopher committed the lesser-included offense of assault by beating, striking, or wounding, for there was no evidence that both Christopher and Robyn physically assaulted Sophia.  Christopher also argues that a jury could find that Sophia's injuries were caused sometime after Christopher beat, struck, or wounded Sophia.  He points to evidence that Sophia fell when Robyn escorted her toward the back of the trailer and that Sophia was placed in the back seat of a car, which was covered with glass.  This evidence does not explain the lacerations on Sophia's face or the blunt trauma to her head, however.  Robyn explained that Sophia did not fall on her face or head, "[t]he farthest she fell was back down to one knee, and that's when she'd get back up, help herself up with the other hand, and I had her other arm."  Robyn further testified that when Sophia was placed in the car, she was laid on her back, on top of a sweater with her head propped up by a jacket.  Although there was evidence that glass debris was found in Sophia's hospital bed, the doctor testified that he "assum[ed] that [debris] came from her clothing."  There was no evidence that the glass somehow caused the cuts on Sophia's face or the blunt trauma to her head.  Accordingly, the jury could not rationally infer from the evidence presented that Christopher committed the lesser offense of assault by beating, striking, or wounding, but not the greater offense of assault resulting in serious bodily injury, and so the district court did not abuse its discretion in denying the lesser-included-offense instruction.

-13-

Jordan argues that a jury rationally could have found that he committed the lesser offenses, because there was some evidence that he did not use a weapon and the jury could have distinguished his conduct from Christopher's to find that Jordan did not cause Sophia's serious injuries. Jordan overlooks the fact that both counts charged him with assaulting Sophia individually and by aiding and abetting Christopher, a fact that we find determinative of his argument under our holding in United States v. Felix, 996 F.2d 203 (8th Cir. 1993).

In Felix, the defendant was charged with assault resulting in serious bodily injury. The victim had been attacked by a group of people: "Some members of the mob struck him with clubs, some hit him with their bare hands, and some kicked him." Id. at 205. Although the defendant denied any involvement, she requested a jury instruction on the lesser-included offense of assault by striking, beating, or wounding. The court denied her request. It explained to the jury that the defendant could be found guilty "even if she had not personally done all the acts constituting the offense, if she had aided and abetted the commission of the offense." Id. at 206. On appeal, the defendant argued that although some of the witnesses testified that they had seen her punch the victim, a jury could find that her punches did not cause serious bodily harm. We rejected the argument, finding it unpersuasive because it was based on the erroneous premise that the individuals involved in the attack were committing separate and different assaults:

> The group attack on [the victim] constituted only one assault, that being an assault resulting in serious bodily injury. Consequently, everyone who took part in the attack was guilty of that offense—either as a principal or as an aider and abetter to the offense. Everyone who delivered a blow or a kick encouraged and aided others in the crime; each person who struck or kicked [the victim] helped incapacitate him so that others could deliver blows or kicks that collectively resulted in serious bodily injury. . . . [E]ven if the jury believed that Felix had only punched [the victim] and that her blows did not by themselves actually

-14-

result in serious injury, she is guilty of the more serious assault as an aider and abetter.

Id. at 207-08. So also in this case, for even if the jury believed that Jordan had only punched Sophia, that he did not use a weapon, and that his blows did not cause serious bodily injury, he is nonetheless guilty of the more serious crimes as an aider and abetter of Christopher.

In so holding, we reject Jordan's argument that a jury rationally could have found that he assaulted Sophia, but that he did not aid or abet Christopher. Jordan cited United States v. Fire Thunder, 489 F.2d 938 (8th Cir. 1974), in support of his argument, a case we find distinguishable. In Fire Thunder, three defendants were charged with assault with dangerous weapons and assault with intent to inflict great bodily injury. There was evidence that the first defendant struck a victim with a guitar, that the second defendant struck the same victim with his hands and grabbed a second victim by the neck, and that the "third defendant entered the home where the incidents here in question occurred, carrying a piece of wood," and assaulted the victims. Id. at 940. The first two defendants' cases were tried together, with the district court refusing to instruct the jury on the lesser-included offense for either count. We reversed and remanded:

> [A]s to the assault with dangerous weapon counts, a jury could conclude that [the second defendant] used only his fists in striking the victim or victims and that [the first defendant] did not wield the guitar in striking [the victim] or that the guitar did not in fact constitute a dangerous weapon. The jury could also find that the blows producing the serious injuries came from the wooden club carried by the third defendant and that neither of the appellants acted in concert with him or with each other.

Id. at 941. On remand in that case, the jury would have been required to resolve several factual disputes, including whether the defendants acted alone or together.

-15-

The record here, however, does not permit a finding that Christopher and Jordan committed separate assaults. Sophia testified that Jordan joined the attack after Christopher said, "Let's kill this little bitch." Other than Angelica, who testified that Jordan did nothing at all, the remaining witnesses testified that Christopher and Jordan together beat Sophia. Accordingly, even if Jordan himself did not use a dangerous weapon or deliver the blows that caused Sophia's serious injuries, he aided and abetted Christopher in committing the more serious crimes, and thus the district court did not abuse its discretion in denying the request for lesser-included-offense instructions.

## C. District Court's Questioning of Emergency Room Doctor

We find no error in the district court's questioning of the emergency room doctor. The doctor had already testified that he had diagnosed Sophia with a closed-head injury and that such a diagnosis indicated "that the person was hit in the head or the face." Accordingly, when the court asked whether Sophia's injuries were consistent with being struck with a solid object, the doctor's answer merely clarified his testimony. Similarly, when the court asked whether his testimony was based upon a reasonable degree of medical certainty, the doctor's affirmative answer simply clarified that he had applied his medical training in diagnosing Sophia. We do not view the doctor's answers as opinion testimony that went beyond the scope of the testimony elicited by the parties and of the information disclosed by the medical records. See United States v. Bamberg, 478 F.3d 934, 941 (8th Cir. 2007) ("A judge may question a witness in order to clarify testimony and to elicit necessary facts. But a judge should not act as an advocate and ask questions merely to emphasize the government's proof." (internal citations omitted)).

## D. Sufficiency of the Evidence

Jordan also argues that the evidence was insufficient to convict him of assault with a dangerous weapon or assault resulting in serious bodily injuries. He reiterates his arguments that the government failed to prove with admissible evidence his status as an Indian and that he used a dangerous weapon or otherwise participated in the assault that caused Sophia's serious injuries. For the reasons set forth above, we reject those arguments.

## III. Conclusion

The judgment is affirmed.

_____