# United States Court of Appeals
### For the Eighth Circuit

_____

No. 23-1890
_____

United States of America

*Plaintiff - Appellee*

v.

Joe David May, also known as Jay May

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Eastern District of Arkansas - Central
_____

Submitted: November 19, 2024
Filed: March 12, 2025
_____

Before SHEPHERD, ARNOLD, and ERICKSON, Circuit Judges.
_____

ERICKSON, Circuit Judge.

A grand jury returned an indictment against Joe May for conspiracy to commit wire fraud, mail fraud, and to violate the Anti-Kickback statute in furtherance of defrauding TRICARE in violation of 18 U.S.C. § 371; multiple counts of wire fraud in violation of 18 U.S.C. §§ 1343 and 2; multiple counts of mail fraud in violation of 18 U.S.C. §§ 1341 and 2; receiving kickbacks in violation of 42 U.S.C. § 1320a-7b(b)(1)(B); two counts of aggravated identity theft in violation of 18 U.S.C.

§ 1028A(a)(1); making false statements to the FBI in violation of 18 U.S.C. § 1001(a)(2); and multiple counts of falsifying documents to obstruct justice in violation of 18 U.S.C. §§ 1519 and 2. May proceeded to a jury trial and was convicted on all counts. The district court sentenced May to 102 months imprisonment and ordered him to pay restitution in the amount of $4,637,322.09. For the reasons that follow, we reverse one of May's convictions and affirm all other matters on appeal.

## I.    BACKGROUND

In 2015, Glenn Hudson worked on commission for CD Medical to promote the services of MedwoRx Compounding Pharmacy. Located in Mississippi, MedwoRx dispensed compounded prescription drugs and mailed the drugs to patients throughout the United States.

Hudson recruited Derek Clifton and others to assist with increasing MedwoRx's sales. At the center of this case was the strategy to target the TRICARE program, which is the medical coverage benefit provided to military members and their families. TRICARE included coverage for prescription medications and was one of the few insurers that paid for compounded prescription drugs. For each prescription filled for a TRICARE beneficiary they referred to MedwoRx, Hudson and Clifton received a portion of the reimbursement paid by TRICARE.

Because MedwoRx could not fill prescriptions without a medical provider's signature, an essential component of the scheme was medical providers willing to participate. Hudson already had a nurse practitioner signing any prescriptions he sent her, and Clifton recruited Joe May, a medical doctor, to also sign prescriptions. Hudson, Clifton, and their recruiters filled in the TRICARE beneficiary's information and the drugs on the prescription form before e-mailing it to the medical provider for signing. Eventually Hudson also sent pre-filled prescriptions to Clifton for May to sign.

Over the course of May's participation in the conspiracy, he signed 226 prescriptions for compounded drugs dispensed by MedwoRx. May never determined that these drugs were medically necessary for the TRICARE beneficiaries. For every patient but one, May neither personally evaluated the individual nor reviewed the medical records of the individual before signing the prescription. In other words, May "rubber-stamped" the pre-filled prescriptions Clifton sent to him.

The one TRICARE beneficiary with a MedwoRx prescription who May treated was a nursing home resident named Mary Holiman. May never recorded the prescription in Holiman's medical file, and her medical history contained no record of a health condition requiring the compounded drugs. In addition, May had the drugs sent to an address where he knew Holiman no longer resided.

Clifton paid May approximately $10,000 to $15,000 in cash for rubber stamping the pre-filled prescription forms. Hudson and Clifton also paid their recruiters, and some TRICARE beneficiaries were paid for participating in the conspiracy.

In May 2015, CBS News reported on a similar scheme to defraud TRICARE involving a Florida compounding pharmacy. CBS interviewed a TRICARE official who explained that spending on compounded drugs had increased from $42 million a month to $300 million a month in the past year. As a result, TRICARE eventually implemented a new claims screening process and reduced reimbursements to a level where the scheme was no longer lucrative. By the end of 2015, Hudson and Clifton had stopped targeting TRICARE beneficiaries.

When the FBI became aware of May's potential involvement in a conspiracy to defraud TRICARE, it issued a subpoena for documents to May. In response, May created false medical records stating that he had evaluated the patients prior to signing the prescriptions. As part of this process, Clifton called the patients and then gave the phone to May, so he could ask them questions about their medical history.

Clifton was unable to reach one of the patients, so they created a fake medical history for the patient. Other records also contained fake injuries to support medical necessity for the prescriptions. May provided the fraudulent medical records to the FBI.

On January 26, 2016, FBI agents interviewed May. During the interview, May falsely told the agents that he signed the MedwoRx prescriptions after he evaluated the patients in person at a hospital or after he talked to them on the phone. May also falsely told the FBI that Clifton neither paid nor offered any type of remuneration to May for signing MedwoRx prescriptions.

Following May's interview, FBI agents interviewed dozens of TRICARE beneficiaries with prescriptions signed by May and confirmed that he had not talked to any of them prior to signing the prescriptions. When the FBI completed its investigation, the grand jury returned an indictment with twenty-two counts against May. The jury found May guilty on all counts, and this appeal followed.

May challenges the admission of some MedwoRx business records and the TRICARE claims records on authentication grounds, and he asserts their admission violated the Confrontation Clause. May objects to a limitation on his cross-examination of Clifton, to the absence of a good faith jury instruction, and to the language of the intent or knowledge jury instruction. He also challenges the government's reference to May's subpoena power during closing argument. Finally, May asserts there was insufficient evidence to convict him of conspiracy, violating the Anti-Kickback law, mail fraud regarding Holiman, and aggravated identity theft.

## II.    DISCUSSION

### A.    Business Records

We review a district court's evidentiary rulings for abuse of discretion. United States v. Patterson, 68 F.4th 402, 415 (8th Cir. 2023). The district court's decision

-4-

is entitled to deference because the judge saw and heard the evidence. United States v. Roberts, 86 F.4th 1183, 1186 (8th Cir. 2023). We review a Sixth Amendment Confrontation Clause challenge *de novo*. United States v. Rainbow, 813 F.3d 1097, 1103 (8th Cir. 2016).

### 1.    *Authentication*

"To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). The proponent must clear only a "low bar" to meet the authentication requirement. United States v. Lamm, 5 F.4th 942, 947 (8th Cir. 2021). A party may authenticate through circumstantial evidence that proves a rational basis that the document is what the party claims it is. Id. at 946-47.

Regarding the MedwoRx business records, May asserts that the authentications were deficient because the certifications were not completed by a custodian, and the certifications allegedly failed to state that the records were kept in the ordinary course of business. Self-authentication of domestic records of a regularly conducted activity requires a certification completed by "the custodian or another qualified person . . . ." Fed. R. Evid 902(11). The individual completing the certification must attest that the record meets the requirements of Rule 803(6)(A)-(C), which includes that the record was kept in the course of a regularly conducted activity of a business. Id.

MedwoRx employee Laura Cialone executed a certification for two e-mails from her business e-mail account. She wrote an e-mail to the principals of CD Medical raising concerns about how their representatives marketed MedwoRx's services. The second e-mail included a response from CD Medical, written primarily by Hudson, along with Cialone's response. As the author and recipient of these e-mails, Cialone was a custodian of the records.

MedwoRx employee Missy Lackey executed a certification for e-mails that contained completed prescription forms for TRICARE beneficiaries. The e-mails originated from Hudson or Clifton, and a CD Medical representative forwarded them to Lackey's business e-mail account for processing. As the recipient of the prescriptions, Lackey was a custodian of the records.

The certifications from Cialone and Lackey both included this statement: "I further certify these e-mails (and e-mail attachments) were kept in the course of a regularly conducted business activity by MedwoRx." This language meets the requirement of Rule 803(6)(C) that the records were kept in the course of a regularly conducted activity of a business.

Custodians of the business records authenticated the MedwoRx documents and certified that they were kept in the course of a regularly conducted business activity. The district court did not abuse its discretion in admitting the documents into evidence.

May also asserts that the authentication of the TRICARE claims records was deficient. The Department of Defense hired Express Scripts to administer all TRICARE prescription drug claims. Express Scripts employee Alyssa O'Neill signed the certification for the TRICARE claims records. Her job responsibilities included responding to subpoenas. The O'Neill certification stated that the records were "kept by Express Scripts in the regular course of business . . . and the record was made at or near the time of the act, event or condition."

A custodian or other qualified person authenticated the Express Scripts documents and certified that they were kept in the course of a regularly conducted business activity. The district court did not abuse its discretion in admitting the documents into evidence.

## 2. *Confrontation Clause*

May also claims that the admission of the MedwoRx and Express Scripts business records violated his Confrontation Clause rights. Generally, the Confrontation Clause is inapplicable to business records meeting the requirements of Rule 803(6) of the Federal Rules of Evidence. United States v. Brooks, 715 F.3d 1069, 1079 (8th Cir. 2013). The Confrontation Clause will only apply to business records if the proffered record is "testimonial." Id. (quoting United States v. Thompson, 686 F.3d 575, 581 (8th Cir. 2012)). "Testimonial" means someone created the record "for the purpose of establishing or proving some fact *at trial*." Id. (quoting Melendez-Diaz v. Massachusetts, 557 U.S. 305, 324 (2009)).

As previously discussed, the business records met the requirements of Rule 803(6). Cialone wrote and received the MedwoRx e-mails before May's indictment, and her e-mails related to the methods used to market MedwoRx compounded drugs. She did not create these e-mails for the purpose of establishing or proving some fact at trial. The Cialone e-mails are non-testimonial. See id. at 1080 (holding the GPS records created by a private security company to locate the robber and recover the stolen money were non-testimonial).

The prescriptions authenticated by Lackey are records necessary to dispense prescription drugs. These records were not created for the purpose of establishing or proving some fact at trial. The prescription records are non-testimonial. See United States v. Wells, 706 F.3d 908, 913 (8th Cir. 2013) (holding that a pharmacy's pseudoephedrine purchase logs are non-testimonial).

Regarding the Express Scripts records, May asserts that they were created for trial because they were presented in spreadsheet format. O'Neill extracted the TRICARE claims detail from the Express Scripts database and imported it into a spreadsheet. For "electronically-stored data, the business record is the datum itself, not the format in which it is printed . . . ." United States v. Keck, 643 F.3d 789, 797 (10th Cir. 2011).

Each TRICARE claim introduced at trial from the Express Scripts database was created when MedwoRx submitted it for reimbursement. Because the TRICARE records were not created for the purpose of establishing or proving some fact at trial, they are non-testimonial.

## B.     Limitation on Clifton Cross-Examination

At trial, May's attorney sought to cross-examine Clifton about allegedly inconsistent statements on his drug use. A notation in hospital intake records from August 2020 stated Clifton did not use drugs. Approximately a year later, Bureau of Prison records stated that Clifton used drugs daily. The district court prevented cross-examination on this alleged inconsistency.

We "will reverse a district court's limitation of cross-examination only where there has been a clear abuse of discretion and a showing of prejudice to the defendant." United States v. Alston, 626 F.3d 397, 403 (8th Cir. 2010). Cross-examination regarding "prior misconduct which is probative of a witness' truthfulness is expressly entrusted to the trial court's discretion by Rule 608(b)." Id. (quoting United States v. McClintic, 570 F.2d 685, 690-91 (8th Cir. 1978)).

Given the lapse in time between the two records regarding drug use, it is unclear that these were inconsistent statements. The hospital intake record also is unclear on whether the reference to no drug use was on that day or from an earlier visit. The district court did not abuse its discretion in limiting cross-examination on this topic.

Even if this were not the case, May suffered no prejudice from this limitation. May's counsel cross-examined Clifton on multiple lies he told his probation officer, his inconsistent statements about paying May, and his potential motive for lying to the jury. May presented evidence to the jury on Clifton's capacity to lie, and the limitation of cross-examination on one more potential lie was not prejudicial.

C.    Jury Instructions

We generally review jury instruction formulations for abuse of discretion. United States v. Asomani, 7 F.4th 749, 751 (8th Cir. 2021) (quoting United States v. Glinn, 863 F.3d 985, 988 (8th Cir. 2017)). May concedes that the abuse of discretion standard applies to both jury instruction issues he raises on appeal.

1.    *Good Faith*

May requested the Eighth Circuit Model Criminal Jury Instruction 9.08A on good faith. The court must give a good faith instruction if there is evidence to support it. United States v. Sherer, 653 F.2d 334, 337 (8th Cir. 1981). "The essence of a good-faith defense is that one who acts with honest intentions cannot be convicted of a crime requiring fraudulent intent." Id. at 338. When a doctor's defense is that she saw the patient on specific dates, but there is conflicting testimony that the patient was somewhere else on those dates, a good faith instruction is not required. Id. at 337. Furthermore, if the jury instructions adequately instruct on the essential element of acting with intent, they are adequate for any good faith defense. United States v. Brown, 478 F.3d 926, 928 (8th Cir. 2007).

May did not testify at trial. The evidence presented to the jury included his statements to FBI agents that he either saw all of the patients at various hospitals or he performed phone evaluations with them. The jury also learned about May's attempt to cover up his lies by forging medical records. The government presented testimony from multiple witnesses that out of all the TRICARE beneficiaries May signed prescriptions for, he saw only one of them, and May performed no phone evaluations. Because there was no evidence to support a good faith instruction, the district court did not abuse its discretion by refusing to give it. Sherer, 653 F.2d at 337.

In addition, for each charge, the district court gave instructions stating the jury must find May acted intentionally, knowingly, or willfully. Based on the

instructions given, they were adequate for any good faith defense counsel wanted to present. Brown, 478 F.3d at 928. The district court did not abuse its discretion in denying the request for a standalone good faith instruction.

### 2.    *Intent or Knowledge*

May also asserts that the formulation of intent or knowledge in Jury Instruction No. 30 was improper. The defense's proposed instruction was identical to the government's proposal except for the government's addition of this sentence: "The intent of a person or the knowledge that a person possesses at any given time may not ordinarily be proved directly because there is no way of directly scrutinizing the workings of the human mind."

There is no abuse of discretion in giving a jury instruction explaining that there is never direct evidence of an individual's state of mind. United States v. Lawson, 483 F.2d 535, 537 (8th Cir. 1973). Without citing to any relevant case law, May asserts that the phrase "workings of the human mind" implies something "sinister." This sentence of the jury instruction states that there is no direct evidence of what the individual was thinking, which is a proper jury instruction. Id. The district court did not abuse its discretion with this formulation of the intent or knowledge jury instruction.

### D.    Subpoena Power Reference in Closing Argument

May next asserts the district court erred in allowing the government to inform the jury of May's ability to subpoena witnesses to testify. The district court has broad discretion over closing arguments to the jury. United States v. Ziesman, 409 F.3d 941, 954 (8th Cir. 2005) (quoting United States v. Beckman, 222 F.3d 512, 526 (8th Cir. 2000)). When defense counsel emphasizes during his closing argument the government's failure to call potentially damaging witnesses, the district court does not abuse its discretion in allowing the government to reference the defendant's subpoena power during its closing argument. Id.

During May's closing argument, his counsel listed seven witnesses who did not testify, repeatedly told the jury they would have wanted to hear from them, and described allegedly missing evidence from the lack of their testimony. Based on defense counsel's statements, the court did not abuse its discretion in allowing the government to reference defendant's subpoena power. Id.

E.    Sufficiency of the Evidence

May appeals the denial of his motion for judgment of acquittal on the charges for conspiracy, mail fraud as to Holiman, and receiving kickbacks. We review a denial *de novo* and view the evidence in the light most favorable to the government. United States v. Brown, 88 F.4th 750, 760-61 (8th Cir. 2023). "We will reverse a district court's denial of a motion for acquittal only if there is no interpretation of the evidence that would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt." Id. at 761 (quoting United States v. Broeker, 27 F.4th 1331, 1335 (8th Cir. 2022)).

The government presented evidence that Clifton recruited May into the conspiracy in approximately January 2015 and that May evaluated almost none of the TRICARE beneficiaries that he signed prescriptions for. Witnesses testified that May would sign any prescriptions Clifton sent him, which was corroborated by the documents showing May signed those prescriptions. May typically signed the prescriptions within minutes of receiving them and changed no details on the prescriptions. A witness also testified that May lied to the FBI about performing patient evaluations and determining that the prescriptions were medically necessary. Witnesses further testified that May tried to cover up his lies by creating false medical documents. See United States v. Davis, 867 F.3d 1021, 1030 (8th Cir. 2017) (concealment is "evidence of consciousness of guilt, and thus of guilt itself"). There was abundant evidence that May joined and participated in a conspiracy with intent to defraud the TRICARE program.

On the charge of mail fraud as to Holiman, the government admitted her medical records and elicited testimony regarding the records. Significantly, her medical records contained numerous references to the patient experiencing no pain yet May wrote her a year's supply for the MedwoRx pain cream. May also wrote a prescription for vitamin blend capsules despite no explanation in the records to support this prescription. May had the prescriptions mailed to the wrong address and did not record the prescriptions in Holiman's medical file to conceal their existence from her other healthcare providers. There was sufficient evidence for a rational jury to find guilt beyond a reasonable doubt on this mail fraud charge.

On the charge of receiving kickbacks, Clifton testified that he paid May between $10,000 and $15,000 cash to sign the prescriptions. While May challenges Clifton's credibility, the jury is the final arbiter of credibility. United States v. Hassan, 844 F.3d 723, 726 (8th Cir. 2016). The FBI's forensic accountant provided circumstantial corroboration of the kickbacks through his testimony of cash deposits in excess of $15,000 into May's bank accounts in 2015, which was a significant increase over the less than $500 in cash deposits made in 2014. There were also text messages from recruiters to Clifton asking how much they had to pay May. We conclude that a reasonable jury could have found May guilty beyond a reasonable doubt of receiving kickbacks.

F.     Aggravated Identity Theft

Finally, May asserts for the first time on appeal that the evidence was insufficient to convict him of the two counts of aggravated identity theft because the government failed to prove that the misuse of another's means of identification was at the crux of the underlying crime. May did not make this argument in his motion for judgment of acquittal, and he did not object to the aggravated identity theft jury instruction. See United States v. Two Hearts, 32 F.4th 659, 664 (8th Cir. 2022) (applying plain error review to argument not raised in motion for judgment of acquittal); United States v. Bolman, 956 F.3d 583, 587 (8th Cir. 2020) (applying plain error review when defendant did not object to the applicable jury instruction).

-12-

May bases this new argument on Dubin v. United States, 599 U.S. 110 (2023), a case decided after his conviction. We also review for plain error arguments not presented to the district court that are based on a Supreme Court decision issued while the case is pending on appeal. See United States v. Willis, 433 F.3d 634, 635 & 637 (8th Cir. 2006) (applying plain error review to an argument based on a Supreme Court case decided two months after the court sentenced the defendant); see also United States v. Pirani, 406 F.3d 543, 549 (8th Cir. 2005) (en banc) ("The plain error principle applies even when, as here, the error results from a change in the law that occurred while the case was pending on appeal.").

To determine plain error, we examine whether the defendant has established (1) an error, (2) that is plain, (3) that affects his substantial rights. United States v. Garbacz, 33 F.4th 459, 467 (8th Cir. 2022) (quoting United States v. Chastain, 979 F.3d 586, 592 (8th Cir. 2020)). If the defendant meets this burden, "the district court has the discretion to correct the error if it seriously affected the fairness, integrity, or public reputation of judicial proceedings." Id. (quoting United States v. Camp, 410 F.3d 1042, 1047 (8th Cir. 2005)). When the challenge is to the sufficiency of the evidence, an error is plain only "if there is no evidence of the defendant's guilt or the evidence on a key element of the offense was so tenuous that a conviction would be shocking." Two Hearts, 32 F.4th at 664 (citations omitted).

As the Supreme Court recently clarified, aggravated identity theft under 18 U.S.C. § 1028A(a)(1) requires the government to prove, as one of the elements, that "the defendant's misuse of another person's means of identification is at the crux of what makes the underlying offense criminal, rather than merely an ancillary feature of a billing method." Dubin, 599 U.S. at 114. In Dubin, the defendant fraudulently billed Medicaid for a higher amount by misrepresenting the provider's credentials. Id. The Medicaid patient voluntarily received the treatment. Id. The crux of the fraud was how the services were rendered. Id. at 117. While the patient's name appeared on the billing form, the Supreme Court held that the use of the patient's name was "ancillary to what made the conduct fraudulent." Id.

One of the aggravated identity theft counts against May involved the identity of Stephen Hegyes. Unlike the other TRICARE beneficiaries with MedwoRx prescriptions signed by May, Hegyes did not voluntarily provide his means of identification. A co-conspirator stole Hegyes's identification to defraud TRICARE. The misuse of his means of identification furthered the underlying wire fraud offense. See United States v. Gladden, 78 F.4th 1232, 1246 (11th Cir. 2023) (the defendant's fraudulent behavior included stealing patients' identities to continue refilling their cancelled prescriptions and then shipping the refills to a co-conspirator). There is no plain error in May's conviction for aggravated identity theft as to Hegyes.

The other aggravated identity theft count involved the identity of Perry Patterson. The government does not defend the Patterson aggravated identity theft count on the underlying offense charged in the superseding indictment and submitted to the jury. Instead, the government asserts that this conviction may be supported by the underlying offense of falsification of records. We cannot affirm a criminal conviction on the basis of a theory not presented to the jury. Chiarella v. United States, 445 U.S. 222, 236 (1980); see also Stirone v. United States, 361 U.S. 212, 217 (1960) (the government cannot try a defendant on charges not contained in the indictment).

In this case, the jury instruction summarizing the indictment stated "Count 40 charges Dr. May with aggravated identity theft for using the name and personal identifying information of TRICARE beneficiary Perry Patterson in connection with mail fraud as set out in Count 18." The jury instruction for aggravated identity theft told the jury that it had to find, as two of the elements, that May used Patterson's means of identification without lawful authority in relation to mail fraud. Because the theory of May using Patterson's means of identification without lawful authority in relation to falsification of records was not submitted to the jury, we will not decide whether this theory has merit. Chiarella, 445 U.S. at 236.

The error on Count 40 made the difference in convicting May on one count, so it affected May's substantial rights and seriously affected the fairness, integrity or public reputation of judicial proceedings. Garbacz, 33 F.4th at 468-69 (citations omitted). We reverse the conviction on Count 40.

While we reverse the conviction on Count 40, this decision does not require a remand for resentencing because the sentence for Count 40 ran concurrently with the sentence for Count 35. Id. at 474. We do remand to the district court with instructions to vacate the $100 special assessment associated with Count 40. Id.

## III.   CONCLUSION

For the foregoing reasons, we reverse the conviction on Count 40. We remand to the district court to vacate the conviction on Count 40, vacate the special assessment on Count 40, and amend the judgment accordingly. We otherwise affirm all other matters raised on appeal.

_____