**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

―――――――――

**No. 23-4675**

―――――――――

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

   v.

ROSE-MARIE NSAHLAI,

        Defendant - Appellant.

―――――――――

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Rossie David Alston, Jr., District Judge. (1:21-cr-00234-RDA-1)

―――――――――

Argued: September 27, 2024                   Decided: November 22, 2024

―――――――――

Before AGEE and HARRIS, Circuit Judges, and KEENAN, Senior Circuit Judge.

―――――――――

Affirmed by published opinion. Judge Agee wrote the opinion, in which Judge Harris and Senior Judge Keenan joined.

―――――――――

**ARGUED:** Marvin David Miller, LAW OFFICES OF MARVIN D. MILLER, Alexandria, Virginia, for Appellant. Jordan Michael Harvey, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF:** Jessica D. Aber, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee.

―――――――――

AGEE, Circuit Judge:

Rose-Marie Nsahlai appeals her convictions arising from a scheme in which she and her husband successfully applied for two Paycheck Protection Program (PPP) loans based on false representations and then used the loan proceeds for unauthorized purposes. On appeal, Nsahlai challenges one of the district court's evidentiary decisions and one of the jury instructions. For the reasons set out below, we find no reversible error and affirm Nsahlai's convictions.

I.

A.

In response to the COVID-19 pandemic, Congress enacted the Coronavirus Aid, Relief, and Economic Security (CARES) Act. Among other things, the CARES Act created the PPP, which would be administered by the U.S. Small Business Administration (SBA). As part of that program, the SBA authorized private financial institutions to issue forgivable loans to small businesses to help them maintain payrolls and rehire laid-off employees. To obtain a PPP loan, applicants submitted SBA applications directly to their local banks, which would then review the information and lend money to approved businesses.

Under the PPP, the amount of an approved loan was typically linked directly to the business's 2019 average monthly payroll.[1] Consequently, as a part of the application

---

[1] Provisions existed for businesses that could not provide the prior year's payroll documentation, but those provisions are not implicated in this case.

process, businesses were required to submit supporting documentation of their tax or payroll records to verify their average monthly payrolls. Further, applicants were required to certify that their entire application—including supporting documentation—was accurate; that they understood that making knowing, false statements as part of the PPP loan application was punishable under federal law; and that all PPP loan proceeds would be used only for specified, authorized business-related purposes.

### B.

The trial record established that Nsahlai and Didier Kindambu had a whirlwind courtship before they married in December 2019.[2] At that time, Nsahlai was employed full-time in the internet cybersecurity field for the U.S. Department of Health and Human Services. Kindambu was an international businessman who had expanded his business into the aviation sector by creating two corporations, Papillon Air, Inc., and Papillon Holdings, Inc. (collectively "the Papillon companies").

Founded in 2019, the Papillon companies had registered offices at Kindambu's northern Virginia residence. In addition, Kindambu acquired hangar and office space for them at the Leesburg Executive Airport. But during the relevant time period, the Papillon companies had no employees or independent contractors working for them. Consistent with that fact, they did not have any payroll obligations, did not report any payroll to the Internal Revenue Service, and did not pay any payroll taxes.

---

[2] Because the Government prevailed at trial, we recount the evidence in the light most favorable to it. *See United States v. Smoot*, 690 F.3d 215, 217 n.1 (4th Cir. 2012).

3

As PPP loans began being issued, a Bank of America employee identified at trial as "Kobe" reached out to Kindambu and explained how the loans worked. Thereafter, Nsahlai joined the men's ongoing conversations to determine what would be required for the Papillon companies to obtain PPP loans. To that end, Nsahlai and Kindambu met with a payroll processing firm under the auspices of the Papillon companies potentially becoming a client. An employee with the firm testified that Kindambu introduced himself and Nsahlai as both being "decision makers for the [Papillon companies,] so [he] could work with either of them." J.A. 381. Nsahlai and Kindambu told him they were unfamiliar with what sort of payroll reports the Papillon companies would need to maintain, and were curious about the services the firm could provide. As part of their discussions, the employee gave Nsahlai examples of payroll reports the firm generated for a client so that she could understand how to track necessary information about employees and payroll details and understand the services the firm provided in creating year-end reports and other forms needed for state or federal tax filings. The employee testified that despite those conversations, the Papillon companies never became clients of his firm.

Instead, Nsahlai used the sample spreadsheets she had procured from the payroll processing firm to create false supporting payroll documentation for the Papillon companies that were uploaded as part of the PPP applications.[3] Contemporaneous messages exchanged between Nsahlai and Kindambu reflect that Nsahlai spent hours

---

[3] The Government introduced testimony delving into the metadata from the supporting documentation that could be traced to the original spreadsheets the payroll firm had provided to her.

manufacturing extensive payroll documentation for the Papillon companies listing fabricated employee and independent contractor names, payroll periods, and related pay and tax information for 2019. There is no evidence in the record that any of the documentation was legitimate. To the contrary, the record shows that the Papillon companies did not operate in any form until mid-December 2019 and paid no employees or independent contractors until well after the relevant PPP time period.

Kindambu electronically signed online applications for two PPP loans—one for each of the Papillon companies—through Bank of America. In support of that application, he uploaded the supporting payroll documentation that Nsahlai had crafted, which reflected a substantial average monthly payroll for over forty employees and independent contractors throughout 2019.

Bank of America approved both loan applications, lending one of the Papillon companies $375,000 and the other $2,126,753. Both loans were deposited into the same existing Bank of America account on May 6, 2020. Before the PPP loans were deposited, that account had just over $100,000 in it.

Two days later, Nsahlai and Kindambu met with a Wells Fargo employee to jointly set up a bank account for a third business they had established, Papillon Air Maintenance Services. Several days later, approximately $1,000,000 was transferred from the existing Bank of America account with the PPP loan proceeds into the Papillon Air Maintenance Services' Wells Fargo business account. The following month, over $800,000 was transferred from that Wells Fargo business account into one of Kindambu's personal

5

checking accounts. Shortly after that, he withdrew over half the funds to pay the couple's closing costs to purchase a new residence.

Bank records also reflect that a few weeks after the PPP loans were deposited into the Bank of America account, approximately $31,500 was transferred into Nsahlai's personal Bank of America account. She then made withdrawals for a host of personal expenditures and transferred approximately one-third of the deposited money into other personal accounts.

## C.

In October 2021, Nsahlai was indicted on charges relating to the Papillon companies' PPP loans and her use of the loan money for unauthorized purposes. She pleaded not guilty and exercised her right to a jury trial on the following charges: conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349 (Count 1); two counts of bank fraud, in violation of 18 U.S.C. §§ 1344(2) and 2 (Counts 2 and 3); and two counts of unlawful monetary transactions, in violation of 18 U.S.C. §§ 1957 and 2 (Counts 4 and 5).[4][5]

Before trial, the parties moved *in limine* to resolve some evidentiary disputes. Of relevance to this appeal, the district court granted the Government's motion to exclude portions of an audio recording that Kindambu's daughter surreptitiously made during a conversation she had with Nsahlai in September 2020. In the excerpts at issue, Nsahlai

---

[4] The Government voluntarily dismissed additional charges before trial.

[5] Kindambu was also indicted on related charges, but he pleaded guilty and his convictions are not at issue in this appeal.

6

claimed that Kindambu had been violent toward her and threatened her at unspecified times. In arguing in favor of the excerpt's admissibility, Nsahlai represented that she wished to introduce this part of the audio recording to present the "bigger picture" about why "she didn't look into some matters that the government claims she knew but she didn't know" concerning the PPP loan events. J.A. 99. Specifically, she argued that although she did not intend to present the formal defense of duress, she intended to argue that "the overall circumstances of [her abusive] relationship" with Kindambu explained why she engaged in the charged conduct. J.A. 99.

The district court determined that the evidence was not relevant and was "inherently prejudicial" given that the contested part of the recording indicating that Kindambu was abusive went to "ancillary circumstances that have nothing to do with" Nsahlai's culpability for the charged offenses. J.A. 101. Beyond the ruling on the admissibility of the recording excerpts, Nsahlai also sought clarification on what evidence, short of a duress defense, she could introduce to explain her reasons for acting as she had. The district court observed that should Nsahlai testify in her defense, it would permit counsel to ask, "Why did you do this?" and then would "give [Nsahlai] some latitude to say that [she] felt [she] needed to do that," but that it would not allow the "term 'abused' or 'beaten' or something like that" to come into evidence. J.A. 102. It reiterated Nsahlai would be allowed to testify that "[s]he felt compelled to do it because of her relationship with her husband," but that it would prohibit testimony that he was physically abusive toward her. J.A. 102.

At trial, Nsahlai exercised her right not to testify in her defense and she did not dispute that she worked with Kindambu to prepare and submit the two PPP loan

7

applications. But through counsel's opening statement, closing argument, and questioning of witnesses (including Nsahlai's sister), Nsahlai introduced as part of her defense that she had a tumultuous relationship with Kindambu and that she was unaware of the fraudulent nature of the PPP loan applications. For example, she argued that she had not known that the supporting documentation for the payroll loans was pure fiction, instead placing all unlawful acts squarely on Kindambu (and Kobe). *E.g.*, J.A. 128–29 ("[Nsahlai] dutifully and enthusiastically agreed when Mr. Kindambu tasked her to help him with the PPP loan applications," but "[s]he didn't question the information that she was told to put into the charts that she helped him with"); J.A. 911 ("[Nsahlai] tried her best to keep [Kindambu] happy. She wasn't aware of the true nature of his corporations. . . . She followed the instructions and guidance from Kobe. She followed the directives from [Kindambu]. Ms. Nsahlai didn't intend to defraud anyone, and she didn't intend to defraud the Bank of America.").

The jury convicted Nsahlai on all five counts. After a hearing, the district court sentenced her to twenty-four months' imprisonment and five years' supervised release. It also ordered $2,501,753.00 in restitution.

Nsahlai noted a timely appeal, and the Court has jurisdiction under 28 U.S.C. § 1291.

## II.

On appeal, Nsahlai raises two issues challenging her convictions. First, she contends the district court's evidentiary rulings improperly limited her ability to present evidence

8

that Kindambu abused her in support of her defense that she acted without the requisite *mens rea* to make any false or fraudulent representations about the Papillon companies. Second, she asserts the jury instructions materially altered the nature of the conspiracy that had been charged in Count 1 of the indictment and improperly said that if the jury convicted her of Count 1 (conspiracy), it could also convict her on Counts 4 and 5 (unlawful monetary transactions). We will address each argument in turn.

A.

Nsahlai first challenges the district court's rulings that prevented her from introducing evidence related to her allegations of domestic abuse. Specifically, she challenges the exclusion of the audio recording excerpt in which she accused Kindambu of abusing her and other unspecified evidence that she was the victim of Kindambu's violent behavior.[6] Nsahlai asserts that the exclusion of this evidence prevented her from fully developing the argument that she lacked the requisite *mens rea* to commit the charged offenses. She submits that if her claimed evidence of domestic abuse had been admitted, the jury could have decided "what weight to give it in determining whether there was a reasonable doubt about [her] *mens rea* regarding knowledge of no employees at the time the spreadsheets were provided for the [PPP] loan applications." Opening Br. 30. In other

---

[6] Apart from the recording excerpt, Nsahlai did not proffer any specific testimony or identify other evidence that she would have introduced to support her accusation that Kindambu physically and mentally abused her. The record does not reflect what she would have testified to concerning the nature of their relationship at the time of the underlying events. In short, the record is silent about what, if any, other evidence of this nature Nsahlai would have introduced despite her broad references to the category of "domestic abuse evidence" that she claims she was not permitted to develop at trial.

words, she argues that evidence of her alleged abuse was relevant to explaining why she did the things she did and why she did not question Kindambu about the Papillon companies such that the jury may have concluded she lacked the requisite specific intent to engage in the charged conduct. Nsahlai maintains that the district court's evidentiary errors stemmed from its mistaken impressions about when evidence of domestic abuse is relevant and probative to negating a finding of *mens rea*.[7]

"We review a district court's evidentiary rulings for an abuse of discretion, and we will only overturn a ruling that is arbitrary and irrational." *United States v. Farrell*, 921 F.3d 116, 143 (4th Cir. 2019) (cleaned up). An abuse of discretion occurs when an evidentiary decision "is guided by erroneous legal principles or rests upon a clearly

---

[7] Nsahlai also intimates that the district court's evidentiary rulings violated her constitutional right to testify in her own defense and to present a complete defense. The record belies that assertion and supports our conclusion that the crux of her complaint is "better framed as" a straightforward evidentiary challenge. *United States v. Malloy*, 568 F.3d 166, 177 (4th Cir. 2009) (recognizing that a defendant's invocation of constitutional terms to challenge an inability to present particular evidence supporting a particular defense is "better framed as an evidentiary argument" and thus subject to abuse of discretion and regular harmlessness review). Contrary to Nsahlai's argument that her constitutional rights were compromised by this ruling, the district court methodically explained the scope of its ruling, repeatedly explained that it would grant Nsahlai latitude in testifying that she felt compelled to act, and reiterated that the decision of whether to take the stand was entirely her own. Based on this record, we readily reject Nsahlai's assertion that the district court forbade her from testifying or that its rulings otherwise infringed on her right to testify or ability to present a complete defense. *See United States v. Prince-Oyibo*, 320 F.3d 494, 501 (4th Cir. 2003) ("[A] defendant's right to present a defense is not absolute: criminal defendants do not have a right to present evidence that the district court, in its discretion, deems irrelevant or immaterial."); *see also Crane v. Kentucky*, 476 U.S. 683, 689–90 (1986) (observing that the "Constitution leaves to the judges who must make these decisions wide latitude to exclude evidence that is . . . only marginally relevant or poses an undue risk of harassment, prejudice, or confusion of the issues" (cleaned up)). Instead, the district court limited Nsahlai's right to present particular evidence, and her challenge to that ruling presents an ordinary evidentiary challenge.

erroneous factual finding." *Brown v. Nucor Corp.*, 576 F.3d 149, 161 (4th Cir. 2009) (cleaned up). And even in the event of an error, we will not reverse if the error was harmless. Fed. R. Crim. P. 52(a). "[T]o find a district court's error harmless, we need only be able to say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *United States v. Johnson*, 617 F.3d 286, 292 (4th Cir. 2010) (cleaned up).

Here, we conclude that the district court did not abuse its discretion in excluding Nsahlai's allegations that Kindambu abused her. To be sure, the threshold for relevance is a low bar, but it nonetheless requires that the evidence be "worth consideration by the jury" or have a "plus value" on the question before that body. *United States v. Hart*, 91 F.4th 732, 742 (4th Cir. 2024) (internal quotations omitted); *see* Fed. R. Evid. 401 (stating that evidence is relevant if it has "any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action"). That bar is not met here. With regard to the audio recording between Nsahlai and Kindambu's daughter, that conversation took place in September 2020, approximately four months after the events giving rise to the charges against her. The vague accusation itself refers to events that occurred at an unknown point in time and without context. Even more non-specific was Nsahlai's broadly stated intention of testifying that Kindambu abused her. On this limited record, we cannot say that the district court abused its discretion in ruling that, if she chose to testify, Nsahlai could not use the words "abuse[]" or "beaten," but could explain that she felt compelled by Kindambu to act as she did. *See* J.A. 102. Under the circumstances presented, generalized allegations that Kindambu abused Nsahlai would

11

have negligible, if any, tendency to make any element of the charged offenses more or less probable.[8]

Even assuming Nsahlai's allegations of abuse cleared the threshold to be legally relevant, the district court did not abuse its discretion in concluding they should be excluded under Federal Rule of Evidence 403. Under that rule, evidence that is relevant may nonetheless be excluded for any of several reasons including that "its probative value is substantially outweighed by a danger of" "unfair prejudice, confusing the issues, [or]

---

[8] Nsahlai asserts that evidence of domestic abuse would have negated a finding that she had the requisite *mens rea* to commit the charged offenses. We are hard pressed to see how that is so. We do not agree with her assertion that the district court misunderstood how she intended to use the evidence of abuse or that such evidence was relevant in the absence of a duress defense.

It's undisputed that Nsahlai was not pursuing a duress defense in this case. Nonetheless, many of her arguments amount to such an affirmative defense, *i.e.*, seeking to excuse her conduct based on fear or compelled behavior. In this way, Nsahlai seeks to gain the benefit of a duress defense without the burden of satisfying its exacting elements. *See e.g.*, *United States v. Bailey*, 444 U.S. 394, 410 (1980) (recognizing that, whatever its precise formula in a particular jurisdiction, "one principle [of duress] remains constant: if there was a reasonable, legal alternative to violating the law, a chance both to refuse to do the criminal act and also to avoid the threatened harm, the defense[] will fail" (internal quotations omitted)).

Although evidence that a defendant is the victim of domestic abuse may be admissible in some cases apart from a duress defense, the district court did not abuse its discretion in ruling it to be inadmissible here. Nsahlai does not argue that evidence of abuse would have contradicted the overwhelming evidence of her involvement in the conspiracy, bank fraud, or unlawful monetary transactions. Nor does she contend that evidence of abuse negated her intent to commit those acts. Instead, she argues that evidence of domestic abuse may have led the jury to *excuse* her "unquestioning compliance with Kindambu's requests" and "why she did not ask" him for more information about the Papillon companies' operations. Opening Br. 33. But those were not questions before the jury, do not relate to the elements of the charged offense, and do not fall within a recognized defense that would allow the jury to acquit despite finding the elements of the offense satisfied. As such, the district court did not abuse its discretion in excluding them. In short, a defendant cannot put on a duress defense under the guise of something else.

12

misleading the jury." Fed. R. Evid. 403. Although the district court relied on prejudice in discussing Rule 403, we conclude that an equally apparent concern would be the risk of confusing the issues and misleading the jury, which was charged with ascertaining Nsahlai's culpability for the charged offenses, which occurred in April and May 2020. Any probative value in her recorded accusation—several months later—that Kindambu had acted violently toward her at some unknown point in time would be substantially outweighed by the risk that the jury would believe it needed to determine matters tangential to assessing her guilt. In particular, evidence of domestic abuse would have led the jury to believe it was somehow relevant to deciding Nsahlai's guilt whether, (1) she was in fact the victim of abuse, and (2) her circumstances were such that she was coerced into doing what she did. Neither of those issues was before the jury in this case and neither was relevant to assessing whether the record established the elements of the charged offenses. Consequently, admitting such evidence could run the very real risk of confusing the issues or misleading the jury.

But even if this evidence cleared both the threshold relevance inquiry and Rule 403's balancing test for admissibility, we would still not find reversible error because any error in excluding this evidence was harmless. The descriptor "overwhelming" certainly fits the evidence of Nsahlai's guilt that exists in this record. The Government introduced numerous witnesses as well as documentary evidence confirming Nsahlai's voluntary, substantial, and knowing role in the charged offenses. She is an educated woman with expertise in computers who actively participated from the planning phases through the execution of the charged offenses. We recount just some of the evidence of Nsahlai's *own*

13

*communications* documenting her role and knowledge—WhatsApp messages, emails, and excerpts from the recorded conversation between Nsahlai and Kindambu's daughter.

First, the Government introduced a series of WhatsApp messages between Nsahlai and Kindambu in which she explains to Kindambu that "we'll create the payroll reports for periods [organized] by employee. SBA [is] not IRS so if you're ready to take a leap of faith and a chance, we'll figure it out." J.A. 929. After Kindambu responds, "Ok u can do," Nsahlai replied, "I'll generate the reports from free templates . . . figure how payments can be justified. . . . We know the risks, lay low on SBA initiatives, do taxes etc." J.A. 930–31. At various points in the enterprise, both parties encouraged each other that they both needed to feel comfortable with the plan before proceeding, with Kindambu telling Nsahlai that she "can judge . . . [i]f you don't feel it leave it," and Nsahlai responding, "[i]f you are ok, we proceed." J.A. 935. Nsahlai later confirmed she would create the "[r]eports and will simply use [the spreadsheets they had received from the payroll processing firm] to ensure it has all relevant information." J.A. 937. She then summarized the process she was using to create the supporting documentation for the Papillon companies' PPP loan applications.

Next, the Government introduced an email from Nsahlai to Kindambu in which she described how she created the numbers necessary to obtain the PPP loans: "To get our numbers, we grossly exaggerated monthly. The first, Papillon we did the monthly was approx. $700,000 to get a loan of $1.7 million." J.A. 955. She then said that Kobe had suggested they seek a $5 million loan, "[w]hich meant the numbers were super high." J.A. 955.

14

In addition, the Government introduced correspondence from April to August 2020 between Nsahlai and a mortgage lender who was requesting more information about the Papillon companies' operations during the relevant time periods. They demonstrate her familiarity with the Papillon companies' operations and her ability to speak on behalf of Kindambu on such matters. What's more, in one of these documents, dated April 27, 2020, Nsahlai represented that the companies "conducted no business activities, [had] no income, and were essentially shells for the applicable tax year. Hence, we also believed we did not have to file taxes for the applicable year," *i.e.*, 2019. J.A. 959. Given that the loan applications were submitted on April 3rd of the same year, correspondence provided to other entities *that same month* directly contradicting the representations in the loan applications are particularly indicative of Nsahlai's knowledge and intent. Put bluntly, these documents show that Nsahlai knew about the Papillon companies' actual (non-existent) operations and payroll obligations for 2019 despite what she represented in the PPP loan application process and in the supporting documentation that she created around the same time.

Last, the Government introduced excerpts from the September 2020 recorded conversation between Nsahlai and Kindambu's daughter. When discussing the couple's finances, Nsahlai asserts, "*I* financed this house," connecting the money used to purchase it to the "2.5 million from the government for loans" that *she* had arranged for him. J.A. 922 (emphasis added). When Kindambu's daughter attributed Nsahlai's role in the home purchase to Nsahlai's citizenship, Nsahlai responded, "You don't understand where the

money came from. . . . [W]ho made it happen? . . . I have done all these things . . . . [T]he loan . . . money is going to be scot-free because of how I did it." J.A. 923–24.

To be clear, the above-recounted evidence is just a fraction of the Government's evidence against Nsahlai at trial. But it's the most relevant evidence to our finding that any error in excluding the evidence of domestic abuse was harmless because it most directly points to Nsahlai's knowing participation in the charged offenses. In short, we conclude that the excluded evidence would not have tipped the needle in the jury's deliberations and its exclusion thus did not have a "substantial and injurious effect or influence in determining the jury's verdict." *United States v. Ferguson*, 752 F.3d 613, 618 (4th Cir. 2014) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

B.

Nsahlai next argues that part of the jury instructions were erroneous, raising two related arguments centered on the instructions for Count 1 of the indictment (the conspiracy charge). First, she argues that the instructions impermissibly allowed her to be convicted on Count 1 based on conduct relating to Counts 4 and 5 (fraudulent monetary transactions) when the indictment did not set out Counts 4 and 5 as relevant conduct to support the conspiracy offense. As a result of this purported discrepancy, Nsahlai contends that she lacked the requisite notice from the indictment as to the nature of the conspiracy charge she had to defend against at trial. Second, Nsahlai argues that the instructions impermissibly allowed the jury to convict her of Counts 4 and 5 so long as it found her

16

guilty of the conspiracy charged in Count 1 when the three charges in the indictment referred to different conduct.[9]

Because Nsahlai did not raise these objections at trial, we review them for plain error. *Puckett v. United States*, 556 U.S. 129, 135 (2009). Under the standard set out in *United States v. Olano*, 507 U.S. 725 (1993), plain-error review has four steps. "First, there must be an error or defect—some sort of deviation from a legal rule—that has not been intentionally relinquished or abandoned, *i.e.*, affirmatively waived, by the appellant." *Puckett*, 556 U.S. at 135 (cleaned up). "Second, the legal error must be clear or obvious, rather than subject to reasonable dispute." *Id.* "Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the district court proceedings." *Id.* (cleaned up). "Fourth and

---

[9] The challenged instruction states:

If you find that the government has proven the defendant guilty of conspiracy beyond a reasonable doubt as charged in Count 1 of the indictment, you may also find the defendant guilty of the crime alleged in the other count in the indictment in which she is charged, provided you find that the essential elements of that count, as defined in these instructions, have been established beyond a reasonable doubt and, provided further, that you also find beyond a reasonable doubt that:

One, at least one of the substantive offenses, as charged in Counts 2 through 5 of the indictments, were committed by a member of the conspiracy as detailed in Count 1 of the indictment.

And two, at least one of the substantive offenses, as charged in Counts 2 through 5, was committed during the existence or life of and in furtherance of the goals and objectives of and in furtherance of the goals or objectives of the corresponding conspiracy, as detailed in Count 1 of the indictment.

And three, at the time that this offense was committed the defendant was a member of the conspiracy detailed in Count 1 of the indictment.

J.A. 869.

finally, if the above three prongs are satisfied, the court of appeals has the discretion to remedy the error—discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* (cleaned up). "Meeting all four prongs is difficult, 'as it should be.'" *Id.* (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 83 n.9 (2004)).

Even assuming that Nsahlai could satisfy the first two steps—something we do not need to decide—her argument fails because she cannot show that any error affected her substantial rights. *See United States v. Vonn*, 535 U.S. 55, 62–63 (2002) ("When an appellate court considers error that qualifies as plain, . . . the defendant who sat silent at trial has the burden to show that his 'substantial rights' were affected.").

When considering jury instruction challenges, "we do not view a single instruction in isolation," but must assess the "allegedly erroneous instruction in its full context." *United States v. Tillery*, 702 F.3d 170, 176 (4th Cir. 2012) (cleaned up). That "full context" includes not just the other instructions, but also the trial as a whole. *See United States v. Park*, 421 U.S. 658, 674 (1975); *see also United States v. Moore*, 810 F.3d 932, 937 (4th Cir. 2016) (affirming conviction where "the totality of the circumstances . . . , including the jury instructions, the verdict form provided to the jury, the arguments of the parties, and the evidence" did not support the conclusion that a constructive amendment occurred).

Here, we are confident that the challenged jury instruction did not affect Nsahlai's conviction for a conspiracy to commit bank fraud, as charged in Count 1 of the indictment. Our conclusion rests on the jury instructions as a whole, the verdict form, and the trial record.

18

Irrespective of the challenged instruction, the remaining jury instructions about Count 1 go on to detail the specific elements the jury had to find before it could find Nsahlai guilty of that offense. And those instructions indisputably required the jury to find that Nsahlai and Kindambu conspired "to devise and intend to devise a scheme and artifice to obtain the monies, funds, credits, assets, and other property owned by and under the control of a financial institution, namely, Bank of America, N.A., by means of materially false and fraudulent pretenses, representations, and promises." J.A. 870. The instructions described the purpose of the conspiracy using this same language and repeatedly informed the jury about what was necessary to prove "the essential elements of the crime of conspiracy *to commit bank fraud*." J.A. 870 (emphasis added); *see also* J.A. 871 ("The offense alleged in Count 1 as an object of the conspiracy is *bank fraud*. . . . In order to fulfill its burden of proof for the crimes of conspiracy to commit offenses against the United States of America, namely, *bank fraud* . . . . [T]he conspiracy agreement or understanding to commit *bank fraud* . . . ." (emphases added)). Thus, while the prefatory instructions concerning Count 1 could be read to suggest that the conspiracy count could be based, in part, on finding any of the violations set out in Counts 2 through 5, the more detailed instructions concerning the elements of Count 1 consistently referred the jurors to bank fraud—something unquestionably within the indictment's scope—rather than to the unlawful monetary transactions charged in Counts 4 and 5. This is not a case where a potentially erroneous instruction existed on its own. To the contrary, the narrower instructions that immediately followed it centered the jury's focus to the necessary findings which, without question, required the jury to make those findings within the scope of the charged conspiracy before

19

it could convict Nsahlai. The juxtaposition of these instructions, read as a whole, fosters confidence in the nature of the jury's verdict.

Bolstering that conclusion, the verdict form completed by the jury reflects its decision finding Nsahlai "Guilty" of "Count 1, Conspiracy to Commit *Bank Fraud*." District Court Docket No. 124 (emphasis added). In short, the verdict form with respect to Count 1 supports our conclusion that the jury's verdict unquestionably aligned with the scope of the conspiracy charged in the indictment. This language from the verdict form undermines Nsahlai's contention of juror confusion and reinforces our conclusion that the jury's verdict would have been the same even without the challenged jury instruction.[10]

As a final observation, our conclusion that no plain error has occurred with respect to the jury instructions is solidified by the overwhelming evidence to support Nsahlai's guilt of the charged conspiracy. When considered in light of the instructions as a whole and the verdict form, the trial record demonstrates that Nsahlai cannot show that any error affected her substantial rights, that is that it would have affected the jury's verdict. Given our prior recitation of much of that evidence, we need only briefly recount it here.

---

[10] The fact that the jury also convicted Nsahlai of both substantive bank fraud charges serves as additional confirmation as well. While this observation is not dispositive given that the jury also convicted Nsahlai of the unauthorized monetary transfers, the guilty verdicts on Counts 2 and 3 (bank fraud) were necessarily based on the same underlying conduct as would have been necessary to convict for Count 1, the "conspiracy to commit bank fraud." The only differences would be for minor variations accounting for the necessary variations for the specific elements of each offense, an agreement to commit versus the commission of the substantive offense. The requisite findings necessary to support Counts 2 and 3 overlap sufficiently with what the verdict form says about Count 1 to support our overarching conclusion that Nsahlai has not demonstrated that the jury's verdict was based on conduct other than that charged in the indictment.

As earlier set out in section II.A., which discusses her evidentiary challenge, the Government introduced multiple witnesses alongside documentary evidence proving Nsahlai's role in the conspiracy to defraud Bank of America by applying for PPP loans for which the Papillon companies did not qualify. Some of that evidence consisted of Nsahlai's own words demonstrating that she planned the fraud with Kindambu and created false supporting documentation to submit as part of the applications, knowing that the supporting documentation did not reflect actual employee and payroll records. She then participated in using the PPP loan money for purposes entirely unrelated to their authorized purposes. Thus, the overwhelming evidence at trial specifically tied Nsahlai to a conspiracy to commit bank fraud, the offense charged in Count 1 of the indictment and of which the jury found her guilty on the verdict form.[11]

---

[11] The validity of Nsahlai's other convictions is also beyond dispute. Nsahlai's jury-instruction challenge does not implicate the validity of her convictions for Counts 2 and 3 (bank fraud).

As for Counts 4 and 5, Nsahlai's argument implicates them only insofar as she claims they could not be the basis for the supporting a conviction on Count 1. She does not directly challenge the sufficiency of the evidence to support her convictions for Counts 4 and 5. To the extent she asserts it was reversible error to say that a conviction for Count 1 permitted the jury to convict on Counts 4 and 5, we disagree. First, that argument ignores the full sentence in which that language appears. The instruction states that the jury "may also find the defendant guilty of the crime alleged in the other count in the indictment in which she is charged, *provided you find that the essential elements of that count, as defined in these instructions, have been established beyond a reasonable doubt.*" J.A. 869 (emphasis added). This instruction does not reasonably allow for the conclusion that the jury might have convicted Nsahlai of Counts 4 and 5 without specifically finding that the Government's evidence satisfied each element of those offenses. And since Nsahlai does not contend that the later instructions setting out the elements of Counts 4 and 5 were erroneous, this language does not warrant reversal.

Under the totality of the circumstances in this case, we conclude that Nsahlai has not shown that the challenged jury instruction affected her substantial rights, *i.e.*, led to her convictions. As such, we conclude she has not shown reversible error on plain-error review.

## III.

Because Nsahlai has not shown that the district court committed reversible error in either its challenged evidentiary rulings or the challenged jury instruction, we affirm her convictions.

*AFFIRMED*