**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 23-4431

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

TREVOR RAEKWON SEWARD,

Defendant – Appellant.

Appeal from the United States District Court for the District of South Carolina, at Florence. Donald C. Coggins, Jr., District Judge. (4:20-cr-00512-DCC-1)

Argued:  January 31, 2025                    Decided:  April 25, 2025

Before WILKINSON, HEYTENS, and BENJAMIN, Circuit Judges.

Affirmed by published opinion. Judge Heytens wrote the opinion, which Judge Wilkinson and Judge Benjamin joined.

**ARGUED:** Joshua Snow Kendrick, KENDRICK & LEONARD, P.C., Greenville, South Carolina, for Appellant. Robert Nicholas Bianchi, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, South Carolina, for Appellee. **ON BRIEF:** Adair F. Boroughs, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee.

TOBY HEYTENS, Circuit Judge:

A jury found Trevor Seward guilty of murdering a rural mail carrier. On appeal, Seward raises two challenges under the Federal Rules of Evidence and one under the Sixth Amendment's Confrontation Clause. We conclude both evidentiary challenges fail on the merits. And although the district court admitted testimony that may have violated the Confrontation Clause as construed in the Supreme Court's post-trial decision in *Smith v. Arizona*, 602 U.S. 779 (2024), we conclude any such error was harmless. We thus affirm.

I.

In 2019, Irene Pressley's body was found falling out of her still-running car on the side of a dirt road in Andrews, South Carolina. Pressley had been shot several times, and investigators found an assault rifle near the body as well as 21 bullet casings at an intersection two miles down the road. Near that intersection, a witness found a package containing two pounds of marijuana addressed to Seward's residence. The package had Pressley's blood on it.

Investigators found significant evidence implicating Seward in Pressley's death. Before she died, Pressley had been delivering mail along her route. When she reached Seward's residence, Pressley did not deliver the package of marijuana to the house but placed a slip in the mailbox saying it could be picked up at the post office. Video from Seward's home security system showed that immediately after Pressley failed to deliver the package, Seward exited the house, got into his car, and drove off in the same direction Pressley had gone, before returning home minutes later. Eleven minutes after returning, Seward left again, this time carrying an assault rifle and wearing a sweatshirt with the hood

2

cinched tightly over his face even though the temperature was above 80 degrees. About an hour later, a witness saw Seward driving Pressley's car going "[b]etween 80 and 90 miles per hour." JA 539. Testing revealed Seward's fingerprints and palm prints on the car and several packages inside it, including a palm print in Pressley's blood.

Seward was charged with murdering a federal employee engaged in official duties, using a firearm during a crime of violence constituting murder, Hobbs Act robbery, possessing a firearm after being convicted of a felony, and conspiring to possess marijuana with intent to distribute it. A jury found Seward guilty on all counts.

## II.

Seward's first two arguments involve evidentiary issues. First, he argues the government's firearms toolmark examiner was not qualified to give expert testimony under Federal Rule of Evidence 702. Second, he asserts the district court erred in preventing him from presenting evidence that a different witness failed a polygraph test. We review non-constitutional "evidentiary rulings" for abuse of discretion. *United States v. Queen*, 132 F.3d 991, 995 (4th Cir. 1997).

### A.

The district court did not exceed its discretion in permitting the firearms toolmark examiner to give expert testimony. The witness testified that when a "bullet travels down the barrel of the firearm," the barrel leaves marks on the bullet casings that can be compared to those left on control casings to determine whether the casings were fired by a specific firearm. JA 743–45. Based on that comparison, the witness testified that the assault rifle found near Pressley's body fired both the bullet casings found at the intersection and others

3

found in Seward's front yard.

Seward launches a broadside attack against toolmark examination, asserting it is neither "grounded in science" nor based on "objective, scientific factor[s]." Seward Br. 8 (first quote); *id.* at 18 (second quote). But this Court recently rejected an argument that such testimony is categorically inadmissible, see *United States v. Hunt*, 99 F.4th 161, 182 (4th Cir. 2024), and we are bound by that decision, see *Taylor v. Grubbs*, 930 F.3d 611, 619 (4th Cir. 2019).

Seward also asserts that this witness lacked the necessary "experience and training" to offer expert testimony and used a method that was "unreliable as employed." Seward Br. 17 (first quote); *id.* at 15 (second quote); see Fed. R. Evid. 702(a), 702(d). The district court rejected those arguments, concluding the witness was "sufficiently qualified by training and experience" to give expert testimony and that the challenged method carried "sufficient indicia of reliability." JA 784–85. The district court acknowledged that Seward "raise[d] a number of legitimate points," which he was "free to explore in depth on cross-examination." JA 784.

We see no abuse of discretion in that ruling. The witness testified she received training in firearms examination with the Bureau of Alcohol, Tobacco, and Firearms (ATF) and worked as a firearms examiner with the U.S. Postal Inspection Service for 18 years. She explained that her laboratory is "accredited" and that technical reviewers at ATF review all her work—including her work in this case. JA 741. The district court permissibly concluded that Seward's points went "to the weight, not the admissibility" of the challenged testimony. *United States v. Fuertes*, 805 F.3d 485, 496 (4th Cir. 2015).

4

B.

The district court also acted within its discretion when it prevented Seward from introducing evidence that a different government witness failed a polygraph test.

At trial, Seward argued that one of the government's witnesses—a distant relative of Pressley's—could have been responsible for her murder. During the government's direct examination of a postal inspector (someone whose job involved "handl[ing] any crime involving the mail," JA 268), the postal inspector denied that there was a search warrant stating that "there was probable cause to believe that [the relative] murdered Irene Pressley." JA 315. On cross-examination, Seward impeached the postal inspector using the search warrant, which stated that "there [was] probable cause to believe that [a] . . . homicide of a federal employee ha[d] been committed . . . by" the relative. JA 377. The district court allowed that line of questioning, concluding "the door's been opened for [Seward] . . . to impeach the witness" because the postal inspector's direct examination testimony had been misleading. JA 355.

But Seward sought to go further by introducing evidence that the relative failed a polygraph test. Seward's theory of admissibility was that the relative's polygraph failure "was used to support the probable cause" that justified the search warrant with which Seward impeached the postal inspector. JA 355. The district court refused to let Seward ask about the polygraph directly but permitted him to ask the postal inspector about what "caused them to seek the search warrant," including the fact that the relative "had been deceptive." JA 361–62. Seward explored that issue on cross-examination, asking the postal inspector whether the relative's statements "seem[ed] inconsistent and untruthful," after

5

which the investigator confirmed: "Right, his story changed." JA 381, 383.

Here too, we see no abuse of discretion. This Court follows a "per se rule that the results of . . . a witness's polygraph test are not admissible to bolster or undermine credibility." *United States v. Prince-Oyibo*, 320 F.3d 494, 497 (4th Cir. 2003). The district court thus had to strike a balance between Seward's right to impeach the postal inspector and the risk that the jury could view any reference to polygraph evidence as undermining the relative's credibility as a witness. We see no abuse of discretion in the district court's chosen solution of letting Seward ask about the relative's deception as a fact supporting probable cause while forbidding Seward from asking the postal inspector directly about the polygraph. See *United States v. Oloyede*, 933 F.3d 302, 312 (4th Cir. 2019) (district courts have "broad discretion to admit evidence in the management of a trial").

## III.

Seward's final argument is that the government's DNA expert gave testimony that violated the Sixth Amendment's Confrontation Clause. Our precedent is clear: "We review de novo *any* alleged violation of the Confrontation Clause," even when the alleged violation involves "evidentiary rulings." *United States v. Freitekh*, 114 F.4th 292, 313 (4th Cir. 2024) (emphasis added) (first quote); *United States v. Williams*, 632 F.3d 129, 132 (4th Cir. 2011) (second quote). Applying de novo review here, we conclude there may well have been a Confrontation Clause violation but that any such error was harmless.

## A.

To be admissible in federal court, evidence must satisfy both the Federal Rules of Evidence and the Confrontation Clause. The two sets of rules overlap because both restrict

6

using out-of-court statements to prove the truth of the matter asserted in those statements. See Fed. R. Evid. 801(c), 802; *Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004). But even though these sources of law share terminology—most notably, the word "hearsay"—the rules they create are separate and distinct.

On the one hand, the Federal Rules of Evidence apply more broadly than the Confrontation Clause. The former govern nearly all proceedings in federal court, see Fed. R. Evid. 1101, but the Confrontation Clause applies only in "criminal prosecutions," U.S. Const. amend. VI. The evidence rules limit evidence offered by the government and the defendant alike, see Fed. R. Evid. 1101; *Taylor v. Illinois*, 484 U.S. 400, 410 (1988), but the Confrontation Clause applies only to evidence offered against "the accused," U.S. Const. amend. VI; see *Giles v. California*, 554 U.S. 353, 376 n.7 (2008). Finally, the Federal Rules of Evidence establish a general rule against hearsay, see Fed. R. Evid. 802, but the Confrontation Clause applies only to out-of-court statements that are "testimonial" in nature, see *Whorton v. Bockting*, 549 U.S. 406, 419–20 (2007).

At the same time, the Supreme Court has "reject[ed] the view" that the Confrontation Clause's "application to out-of-court statements introduced at trial depends upon 'the law of Evidence for the time being.'" *Crawford*, 541 U.S. at 50–51 (quoting 3 J. Wigmore, Evidence § 1397, p. 101 (2d ed. 1923)). In its path-marking decision in *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court held that "[w]here testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protections to the vagaries of the rules of evidence." *Id.* at 61. The Confrontation Clause thus forbids introduction of some out-of-court statements that even

the most well-established evidentiary rules would permit.

In the two decades since *Crawford*, the Supreme Court has been clear that it meant what it said. See *Mathis v. United States*, 579 U.S. 500, 514 (2016) ("[A] good rule of thumb for reading our decisions is that what they say and what they mean are one and the same."). It has told us that the "Confrontation Clause applies to forensic reports" because such reports are "testimonial" and "offered to prove the truth of what they asserted." *Smith*, 602 U.S. at 785 (citing *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 308 (2009)). As a result, "a prosecutor cannot introduce an absent laboratory analyst's testimonial out-of-court statements to prove the results of forensic testing." *Id.* at 783. The Supreme Court has further explained that the Confrontation Clause does not permit the government "to introduce" one lab analyst's written findings through the "surrogate testimony" of another because the defendant "ha[s] the right to confront" the author of the written findings. *Id.* at 786 (quoting *Bullcoming v. New Mexico*, 564 U.S. 647, 661, 663 (2011)).

Most recently, the Court clarified—in a decision that issued after the trial in this case—that "[w]hen an expert conveys an absent analyst's statements in support of his opinion, and the statements provide that support only if true, then the statements come into evidence for their truth." *Smith*, 602 U.S. at 783. As a result, "the Confrontation Clause will bar [the] admission" of such statements if they are also testimonial. *Id*. In *Smith*, an analyst ran tests on several items and prepared "a set of typed notes and a signed report . . . about the testing." *Id.* at 790. At trial, a different analyst testified, first explaining "what [the first analyst's] records conveyed about her testing of the items" and then reaching an "independent opinion" about the results of the testing. *Id.* at 791 (quotation marks

8

removed). The Court held the first analyst's statements "came in for their truth . . . because they were admitted to show the basis of [the second analyst's] expert opinions." *Id.* at 798. So even though the non-testifying analyst's statements might well have been admissible under the rules of evidence governing expert testimony, see, *e.g.*, Fed. R. Evid. 703, the Confrontation Clause barred their admission against a criminal defendant, see *Smith*, 602 U.S. at 793–94.

Seward concedes that much of the government's DNA expert's testimony raises no issues under the Confrontation Clause. Oral Arg. 1:50–2:29. The expert explained what DNA is, where it is found, and how it is tested. She described how analysts create a "DNA profile" from swabs collected at crime scenes, and how profiles can be compared to a "known sample" to determine the source of the DNA. JA 904. And she discussed the "quality assurances" her lab follows to ensure it produces reliable results. JA 906. That is all perfectly fine under the Confrontation Clause. See *Smith*, 602 U.S. at 799 (discussing permissible testimony based on a witness's "personal knowledge").

Now comes the problem. The DNA expert admitted that she was not "hands-on with the evidence samples" in this case and that a non-testifying analyst tested the samples. JA 907. The DNA expert explained her role was to review the analyst's notes and work, and then to "independently review the [analyst's] conclusions" to ensure she agreed with the analyst. JA 908. The DNA expert then discussed each DNA sample taken from the crime scene, testified that her "lab analyze[d]" each swab (seemingly according to the procedures she had explained earlier), and provided her conclusions—all without having tested the samples herself. *Id.*

We hold this testimony was offered for the truth of the matter asserted and so implicates the Confrontation Clause. As in *Smith*, the testifying witness relied on the work produced by another analyst to reach her expert conclusions. See 602 U.S. at 798. As in *Smith*, the witness "could opine" about the DNA profile produced by the other analyst "only because [she] accepted the truth of what [the non-testifying analyst] had reported about her work in the lab." *Id.* And, as in *Smith*, the non-testifying analyst's statements thus "came in for their truth . . . because they were admitted to show the basis of [the DNA expert's] opinions." *Id.* [*]

To be sure, the testifying witness in *Smith* more overtly put the non-testifying analyst's out-of-court statements on the record than the government's DNA expert did here. See *Smith*, 602 U.S. at 796–97 (witness testifying to details of non-testifying analyst's notes). By contrast, the DNA expert at Seward's trial first testified extensively about her lab's typical procedure for analyzing swabs and then about her analysis of the swabs that had been collected in this case. The obvious implication—indeed, the only way the testimony makes sense—is that the DNA expert was representing that the non-testifying analyst who ran the underlying tests in fact followed the procedures the DNA expert had just described. But the government may not sidestep the Sixth Amendment problems created by having a witness testify to their opinions that are founded on a non-testifying

---

[*] If instead, the testifying witness and the analyst had worked together to test the swabs, either person could testify without implicating the Confrontation Clause because such testimony would be based on personal knowledge and observations rather than out-of-court statements by a nontestifying witness. See *Smith*, 602 U.S. at 796.

10

analyst's out-of-court statements by simply omitting any questions about the analyst's work. "Approving that practice would make" *Smith* and several other post-*Crawford* decisions "a dead letter, and allow for easy evasion of the Confrontation Clause." *Smith*, 602 U.S. at 798.

The government responds by citing our pre-*Smith* decision in *United States v. Summers*, 666 F.3d 192 (4th Cir. 2011). In *Summers*, this Court held that a DNA expert could testify to his own independent conclusions, even though the analyst who did the underlying lab work would not be testifying. *Id.* at 201. In reaching that conclusion, we emphasized "the predominance" of the testifying expert's "independent subjective opinion and judgment relative to the lesser emphasis accorded the objective raw data generated by the [non-testifying] analyst." *Id.* We also described the testifying expert's opinion as "an original product that could be (and was) readily tested through cross-examination." *Id.* at 202 (quotation marks removed).

We conclude that approach is no longer tenable after *Smith*. True, "[a] Supreme Court decision overrules or abrogates our prior precedent only if our precedent is impossible to reconcile with" that decision. *Short v. Hartman*, 87 F.4th 593, 605 (4th Cir. 2023) (quotation marks removed). But that "high bar" is satisfied here. *Id. Smith* makes clear that the government may not "eva[de]" the Confrontation Clause by offering testimony that is based on a non-testifying analyst's work "as long as [the testifying expert] bases an independent opinion on that material." 602 U.S. at 798–99 (quotation marks removed). *Smith* also emphasizes that a criminal defendant has "a right to cross-examine the testing analyst about what she did and how she did it and whether her results should be

11

trusted"; the ability to cross-examine someone else is insufficient to avoid a Confrontation Clause problem. *Id.* at 799. This Court's contrary language in *Summers* has thus been abrogated.

What we have said so far is not enough to conclude the Confrontation Clause was violated here, however. "To implicate the Confrontation Clause, a statement must be hearsay ('for the truth') *and* it must be testimonial—and those two issues are separate from each other." *Smith*, 602 U.S. at 800 (emphasis added). We thus could not hold that the challenged testimony violated the Confrontation Clause without determining "exactly which of" the non-testifying analyst's statements were "at issue" and the "primary purpose" for which those statements were made. *Id.* at 801–02. Although some statements produced by analysts are testimonial because they serve "an evidentiary purpose," others— such as "lab records" written "to comply with laboratory accreditation requirements or to facilitate internal review and quality control" or "notes . . . written simply as reminders to self"—serve no evidentiary purpose and are not testimonial. *Id.* at 802.

The problem is that neither the district court nor the parties have meaningfully addressed the testimonial issue. The district court overruled Seward's Sixth Amendment objection on grounds we have concluded cannot survive the Supreme Court's decision in *Smith*. Compare *Summers*, 666 F.3d at 201–02, with JA 890–91. Seward's opening brief does not meaningfully address the testimonial question, nor does the government's brief ask us to affirm the district court's ruling on that alternative ground. Absent another way of deciding this appeal, we likely would need to remand to the district court to consider the testimonial issue in the first instance.

12

Fortunately, there is another option. "[M]ost constitutional errors can be harmless," *Arizona v. Fulminante*, 499 U.S. 279, 306 (1991), including Confrontation Clause violations, see *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). We thus assume for argument's sake that the non-testifying analyst's statements were testimonial and affirm on the ground that any error was "harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967).

## B.

Even putting aside all evidence that potentially violated the Confrontation Clause, the government offered overwhelming evidence of Seward's guilt. Seward was convicted after a six-day jury trial during which nearly 30 witnesses testified. The government offered evidence that Pressley refused to deliver a package containing two pounds of marijuana to Seward and that Seward immediately left his home to confront Pressley after she did so. The jury saw video footage showing Seward returning home and leaving minutes later carrying an assault rifle that a senior ATF agent testified had numerous physical similarities to the one found near Pressley's body. It also heard from an eyewitness who saw Seward driving Pressley's car shortly before her death.

The government also offered significant forensic evidence that Seward does not challenge on appeal. Seward's fingerprints and palm prints were found on packages in Pressley's car, and his palm prints were found in three places on Pressley's car. On one package, Seward left a palm print in Pressley's blood.

In contrast, the DNA expert's testimony was comparatively limited. Her testimony boiled down to one conclusion implicating Seward: that his DNA profile could not be

13

excluded from blood found inside Pressley's car door. And that testimony did not go unanswered; instead, Seward thoroughly challenged the expert's independent conclusions through vigorous cross-examination. Given the overwhelming nature of the government's evidence, and the comparatively limited evidence offered by the DNA expert, we conclude any error in admitting that testimony was harmless beyond a reasonable doubt.

*     *     *

The judgment is

*AFFIRMED*.