**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 24-4488**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

RAMI MAHMOD MHANA,

Defendant – Appellant.

**No. 24-4533**

UNITED STATES OF AMERICA,

Plaintiff – Appellant,

v.

RAMI MAHMOD MHANA,

Defendant – Appellee.

Appeals from the United States District Court for the Western District of North Carolina, at Charlotte.  Max O. Cogburn, Jr., District Judge.  (3:22-cr-00078-MOC-SCR-1)

Argued:  October 24, 2025                    Decided:  May 12, 2026

Before KING, RUSHING, and BENJAMIN, Circuit Judges.

---

Affirmed in part, reversed in part, and remanded by published opinion. Judge Rushing wrote the opinion, in which Judge King and Judge Benjamin joined.

---

**ARGUED:** Mark A. Jones, BELL, DAVIS & PITT, P.A., Winston-Salem, North Carolina, for Appellant/Cross-Appellee. Amy Elizabeth Ray, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee/Cross-Appellant. **ON BRIEF:** Russ Ferguson, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee/Cross-Appellant.

---

RUSHING, Circuit Judge:

Rami Mhana appeals his convictions for money laundering, conspiracy, and transportation of stolen goods. His appeal exclusively challenges the district court's trial rulings admitting certain documents into evidence. The Government cross-appeals from the district court's denial of its request for forfeiture. We affirm Mhana's convictions, reverse the district court's forfeiture ruling, and remand for entry of a forfeiture judgment.

I.

Operating a business initially called Wireless City Fashion and later renamed Protocol, Mhana paid in cash and below market value for fraudulently obtained latest-generation Apple iPhones and other personal electronics, which he then shipped in bulk to buyers overseas. His suppliers included individuals who used stolen personal-identifying information to purchase electronics from big-box stores and wireless carriers. Mhana did not require identification from his suppliers, ask how their electronics were obtained, or issue receipts. But he did check whether the phones they sold were "unlocked" and therefore available to be used on any cellular network, or "locked" and restricted to a single network. Although wireless carriers unlock customers' phones for free after their financial obligations are satisfied, Mhana paid third-party services to unlock phones that he purchased. The Government began investigating Mhana after one of his overseas shipments of fraudulently obtained electronics ruptured during transit. Ultimately, the Government uncovered thousands of transactions in fraudulently obtained electronics.

A federal grand jury charged Mhana with four counts of transporting stolen goods in interstate and foreign commerce, 18 U.S.C. § 2314; one count of conspiring to do the

3

same, 18 U.S.C. § 371; and two counts of money laundering, 18 U.S.C. § 1956(a)(1)(A)(i). After a six-day trial, a jury found Mhana guilty on all counts.

The indictment also contained a forfeiture notice, and the jury returned a special verdict finding that a nexus existed between certain of Mhana's property and his criminal offenses. After the verdict, the district court granted the Government's motion for a preliminary order of forfeiture, finding Mhana liable for a $3,649,033 money judgment, among other things. At sentencing almost a year later, however, the court ordered Mhana to pay restitution but refused to enter a forfeiture judgment.

The district court entered its final judgment on September 4, 2024. Mhana appealed the same day, and the Government subsequently filed a timely cross-appeal.

## II.

Mhana asserts only evidentiary arguments on appeal. He contends the district court erred by admitting certain documents into evidence under the business records exception to the rule against hearsay, *see* Fed. R. Evid. 803(6), and admitting other documents into evidence as summaries of voluminous records, *see* Fed. R. Evid. 1006. We review evidentiary rulings for an abuse of discretion, which occurs when "an evidentiary decision is guided by erroneous legal principles or rests upon a clearly erroneous factual finding," or the decision is otherwise "arbitrary and irrational." *United States v. Nsahlai*, 121 F.4th 1052, 1060 (4th Cir. 2024) (internal quotation marks omitted). "[E]ven in the event of an error," however, "we will not reverse if the error was harmless." *Id.*; *see* Fed. R. Crim. P. 52(a). An error is harmless if we can "say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not

4

substantially swayed by the error." *Nsahlai*, 121 F.4th at 1060 (internal quotation marks omitted).

A.

To begin, Mhana contends that the district court abused its discretion when it admitted spreadsheets produced by wireless carriers—exhibits 14A, 27A, 27B, 27C, and 28—under the business records exception to the rule against hearsay.  Under Federal Rule of Evidence 803(6), "[a] record of an act, event, condition, opinion, or diagnosis" is excepted from the rule against hearsay if:

> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
>
> (C) making the record was a regular practice of that activity;
>
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
>
> (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6).  Mhana raises three arguments, which we address in turn.

1.

First, Mhana argues that the wireless carrier spreadsheets did not comply with Rule 803(6) because they were created for the purpose of litigation.  In the context of electronically-stored data, however, "'the business record is the datum itself, not the format in which it is printed'" or displayed.  *United States v. May*, 131 F.4th 633, 641 (8th Cir. 2025) (quoting *United States v. Keck*, 643 F.3d 789, 797 (10th Cir. 2011)); *see Gen. Ins.*

5

*Co. of Am. v. U.S. Fire Ins. Co.*, 886 F.3d 346, 359 (4th Cir. 2018) ("That the loss runs were printed out from [the company's] database for purposes of this litigation does not impact the admissibility of the loss runs because 'evidence that has been compiled from a computer database is also admissible as a business record, provided it meets the criteria of Rule 803(6).'" (quoting *U-Haul Int'l, Inc. v. Lumbermens Mut. Cas. Co.*, 576 F.3d 1040, 1043 (9th Cir. 2009))).

The wireless carriers created these spreadsheets in response to Government subpoenas requesting information regarding approximately 10,020 personal electronic devices by reference to their International Mobile Equipment Identity (IMEI) numbers. Crucially, as explained below, representatives from each wireless carrier testified that the data in the spreadsheets were entered at or near the time of the event by someone with knowledge, regularly maintained in the course of business, and existed in the spreadsheets exactly as they existed in the carriers' databases.

a.

The Verizon representative testified that exhibit 14A was generated from a spreadsheet template that pulled data from Verizon business records for the IMEIs the Government provided. Specifically, exhibit 14A "is the transactional and account information associated to those [IMEIs]." J.A. 483. He testified that the spreadsheet template was created "more than eight years ago" and "ever since" it was created, "on every investigation we've done, we pull the same exact data," "[w]e don't manipulate the data," and "[w]e give the data in full, as it is, to whoever requests it." J.A. 503. He further testified that—except for columns BS and BT—the information in exhibit 14A was kept in

6

the ordinary course of Verizon's business as a wireless provider, was maintained in Verizon's business records exactly as it existed in the spreadsheet, was entered at or near the time when the transactions on the sheet were noted by a person with knowledge or who had responsibility to make those entries, and was used by Verizon for billing, marketing, and investigations. *See* J.A. 506 ("Q: If you take each line of this data, . . . it exists in your system like that?  A: Yes.").

Columns BS and BT reflect information that was not admissible as Verizon's business records, and the district court accordingly required the Government to redact those columns from exhibit 14A.  Mhana's passing assertion that the existence of these redacted columns somehow "disqualified the entire exhibit" is unconvincing.  Opening Br. 50. There is no indication that any of the spreadsheet's visible data incorporated, or was otherwise affected by, the information in columns BS or BT.  The district court therefore correctly ruled that, with these columns redacted, exhibit 14A satisfied Rule 803(6).

b.

The AT&T representative similarly testified that the data in exhibits 27A, 27B, and 27C were "pulled directly out of data warehouses and then input in [spreadsheet] format" with a template that AT&T had been using for "at least seven years."  J.A. 776. Specifically, the representative testified that AT&T queried its billing and transit databases with each IMEI the Government supplied and then produced its data about those IMEIs in the spreadsheet template.  He further testified that the information in exhibits 27A, 27B, and 27C was recorded in the regular course of AT&T's business activity as a wireless carrier, that it was AT&T's regular practice to make the entries that appeared in the

7

spreadsheets, and that the entries were made or transmitted by a person with knowledge of those transactions at or near the time of the denoted events.

Mhana complains that exhibit 27C mentions carriers other than AT&T, which he surmises cannot reflect AT&T's own business records.  But the AT&T representative testified that AT&T maintained, in its own database, information about some IMEIs that other carriers had placed on the blacklist, or blocklist, which is a database used to identify electronic devices that wireless carriers have determined were lost, stolen, or obtained through fraud.  He explained that AT&T possessed "some information on other carriers" because in the regular course of business it would "check to see if . . . devices have been blacklisted or blocklisted" "before the devices c[ould] be used on our network."  J.A. 791. The district court did not abuse its discretion in determining that exhibits 27A, 27B, and 27C satisfied Rule 803(6).

c.

The representative from Sprint, now T-Mobile, likewise testified that to create exhibit 28, he and his team "bulk-uploaded [the IMEIs that the Government provided] into our system," retrieved the information "already in our system" about the IMEIs that belonged to Sprint, and produced that information in the spreadsheet "in the same condition as it was" in Sprint's recordkeeping system.[1]  J.A. 916–918.  He further confirmed that the information in exhibit 28 "was collected . . . from the point of sale, throughout the transaction," was added to Sprint's database by a person with knowledge of those events

---

[1] T-Mobile acquired Sprint in 2020.  The witness previously worked for Sprint and now works for T-Mobile.

and reason to do so in accordance with Sprint's regular practice, was kept in the ordinary course of Sprint's business as a wireless provider, and was produced from Sprint's system without change. J.A. 916–918.

Mhana alleges that exhibit 28 was "collaboratively prepared by the Government" because the Government limited the exhibit "to only 10 rows of data that specifically relate[d] to its next two trial witnesses." Opening Br. 51. But Mhana offers no reason to think that exhibit 28, even as limited to ten IMEIs, contained anything other than Sprint's business records regarding those ten devices. The district court did not abuse its discretion in finding that exhibit 28 satisfied Rule 803(6).

2.

Second, Mhana asserts that the spreadsheets included inadmissible data: specifically, the wireless carriers' conclusions that certain IMEIs were associated with fraud. The basis for Mhana's objection is unclear—he mentions "layers of hearsay" and having no opportunity to examine the method by which these fraud determinations were made, *see* Opening Br. 51–52, 66–68, and also calls the fraud determinations "reversibly prejudicial," Reply Br. 26 n.2. We are satisfied that the district court did not abuse its discretion.

Regarding hearsay, the fraud determinations were business records of the wireless carriers, as explained above. Each wireless carrier witness testified that the fraud determinations were made by employees with authority to make such determinations, were made upon investigation and with personal knowledge, and were made in the regular course of the carrier's business. To the extent that any of those determinations were based

9

on information supplied by customers, that information was verified by the carriers. *Cf. United States v. Pendergrass*, 47 F.3d 1116 (Table), 1995 WL 56673, at *5 (4th Cir. 1995) (holding that forms with information supplied by customers were business records of a company, where the company took steps to verify the information contained therein).

As for prejudicial effect, the district court delivered a limiting instruction for each wireless carrier spreadsheet exhibit, cautioning the jury that the carriers' fraud determinations did not "decide[] any issue" in the case and "should have nothing to do with [the jury's] findings," which must be based on the law as provided by the court and applied to Mhana. J.A. 539, 786–787, 919. On appeal, Mhana expresses no qualm with this instruction, which forbade any improper use of the carriers' fraud determinations.[2]

3.

Third, Mhana contends that admitting the wireless carrier spreadsheets into evidence violated the Confrontation Clause because the witnesses who presented the exhibits "did not determine, code, or prepare all the relevant data entries contained therein." Opening Br. 54–55. "'To implicate the Confrontation Clause, a statement must be hearsay ("for the truth") *and* it must be testimonial—and those two issues are separate from each other.'" *United States v. Seward*, 135 F.4th 161, 169 (4th Cir. 2025) (quoting *Smith v. Arizona*, 144 S. Ct. 1785, 1801 (2024)). "The latter, [the Supreme Court] has stated, focuses on the 'primary purpose' of the statement, and in particular on how it relates to a

---

[2] Mhana also asserts that the wireless carrier spreadsheets were incomplete because they "should have included the date that the blacklisted phones detailed therein were added to the blacklist." Reply Br. 25. But he has not demonstrated that the carriers possessed that information in their records.

future criminal proceeding." *Smith*, 144 S. Ct. at 1801. "[B]usiness records are generally not testimonial if they are 'created for the administration of an entity's affairs' rather than for 'proving some fact at trial.'" *United States v. Keita*, 742 F.3d 184, 190 (4th Cir. 2014) (quoting *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009)).

Mhana's Confrontation Clause challenge fails because the business records are the data themselves, not the format in which the data are presented. *See Gen. Ins. Co. of Am.*, 886 F.3d at 359; *May*, 131 F.4th at 641. As we have explained, the data in the spreadsheets were "created for the administration of [the wireless carriers'] affairs" and not for the purpose of "proving some fact at trial." *Keita*, 742 F.3d at 190 (internal quotation marks omitted); *see also May*, 131 F.4th at 641. Accordingly, the data are non-testimonial and do not implicate the Confrontation Clause.

## B.

We next consider the documents that Mhana contends were erroneously admitted into evidence as business records of Wireless City Fashion or Protocol. Those documents can be grouped into three categories.

## 1.

First, exhibits 201–219 are invoices reflecting sales of electronics and related accessories to Mhana or his business. Mhana produced these invoices to the Government in response to a grand-jury subpoena for his business records. When Mhana produced these invoices, he expressly certified, consistent with Rule 902(11), that they met the requirements of Rule 803(6)(A), (B), and (C).

11

The district court did not abuse its discretion in admitting these exhibits under Rule 803(6) because Mhana certified that the invoices contained in these exhibits met the requirements of that rule.  *See* Fed. R. Evid. 803(6)(D) (requiring that "these conditions [be] shown by" testimony "or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification").  Mhana observes that the invoices were created by third parties, but "Rule 803(6) does not 'require[] that the records be created by the business having custody of them.'" *Gen. Ins. Co. of Am.*, 886 F.3d at 358 (quoting *United States v. Wein*, 521 Fed. App. 138, 140 (4th Cir. 2013) (quoting *United States v. Duncan*, 919 F.2d 981, 986 (5th Cir. 1990) (finding that insurance companies' records compiled from hospital records qualified as business records of the insurance companies))).  The district court properly accepted Mhana's certification that these invoices were business records of his company.

2.

Exhibits 220–255 are also invoices for electronics sold to Mhana or his business from the same resellers as exhibits 201–219, in the same format, and around the same time.  Unlike exhibits 201–219, however, Mhana did not produce the invoices in exhibits 220–255 with a Rule 902(11) certification.  Rather, the Government seized these invoices during a search of Protocol's computer.  On appeal, Mhana argues that the invoices were inadmissible because no custodian or other qualified witness testified that these documents met the conditions of Rule 803(6)(A), (B), and (C).

We need not resolve this objection because, even assuming exhibits 220–255 were admitted in error, any error was harmless.  Neither exhibits 220–255 nor the IMEIs

12

identified therein directly supported any of Mhana's convictions, and the jury otherwise heard overwhelming evidence of Mhana's guilt.[3]  Moreover, exhibits 220–255 were so similar to exhibits 201–219 that they did not add anything of significance to evidence that Mhana agreed was admissible pursuant to Rule 902(11).

3.

Third, we consider exhibits 303, 304, 320, 322, and 325.  These exhibits are emails to Mhana's business email account sent from third-party companies, Blowfish Unlocks and SwiftUnlocks, advertising phone unlocking services.  Mhana testified that he received these advertisements during the time he was doing business with those companies.  On appeal, Mhana argues that the district court abused its discretion by admitting these emails into evidence as business records of Protocol and Wireless City Fashion.

The Government does not defend the district court's business records ruling but instead responds that the Government offered these advertising emails not for the truth of their content but for their effect on Mhana, a permissible non-hearsay purpose.  *See* Fed. R. Evid. 801(c)(2).  At trial, however, the Government did not establish that Mhana had seen these particular emails.  Without having established that Mhana read the emails, the Government could not have used them to prove an effect on Mhana.  Further, the Government's line of questioning suggests that it offered the emails for the truth of the

---

[3] The Government used IMEIs from these exhibits, among many others, to create the list of approximately 10,020 IMEIs that it sent to wireless carriers, which they then used to create the spreadsheets previously discussed (exhibits 14A, 27A, 27B, 27C, and 28).  Mhana does not suggest that exhibits 220–255 needed to be in evidence for this purpose.

13

matter asserted—i.e., that the companies provided the services advertised at the prices stated therein.

Even assuming the district court abused its discretion by admitting these emails into evidence, however, any error was harmless. *See United States v. Cone*, 714 F.3d 197, 220 (4th Cir. 2013) (reasoning that "it would be insufficient to survive a hearsay challenge simply to say that since a business keeps and receives e-mails, then *ergo* all those e-mails are business records falling within the ambit of Rule 803(6)(B)," but finding the error harmless in that case). Testimony and other admissible evidence firmly established that Mhana knowingly paid for third-party unlocking services in bulk. For example, Mhana confirmed at trial that he knew "Blowfish to be a third-party unlocker," J.A. 1508, and that he paid Blowfish to unlock phones "all the time," J.A. 1510. The Government introduced into evidence text messages extracted from Mhana's phone, in which Mhana says to a Blowfish representative, for instance, "If you can't unlock it by Monday, please refund my money, thank you" and "I have $11,156.55 on hold for the unlock. I cannot wait for a long time. Please try to unlock it ASAP." J.A. 1510. The Government also introduced text messages Mhana sent to his brother containing screenshots of emails he received from SwiftUnlocks and Blowfish, including a Blowfish advertisement much like the ones at issue here advertising, among other things, its "service for cleaning . . . bad IMEI devices." J.A. 1086. Exhibits 303, 304, 320, 322, and 325 were "cumulative to other admissible evidence," and, in view of the evidence as a whole, we can say with fair assurance that they did not substantially sway the jury's verdict. *United States v. Wood*, 741 F.3d 417, 426 (4th Cir. 2013); *see Nsahlai*, 121 F.4th at 1060.

14

C.

We turn now to the exhibits that Mhana contends were not properly admitted into evidence as summaries of voluminous materials. Two rules of evidence are relevant to this issue.

Rule 1006 authorizes a district court to "admit as evidence a summary, chart, or calculation offered to prove the content of voluminous admissible writings, recordings, or photographs that cannot be conveniently examined in court, whether or not they have been introduced into evidence." Fed. R. Evid. 1006(a). Documents admitted under this rule "serve '*as a surrogate* for underlying voluminous records that would otherwise be admissible into evidence.'" *United States v. Oloyede*, 933 F.3d 302, 310 (4th Cir. 2019) (quoting *United States v. Janati*, 374 F.3d 263, 272 (4th Cir. 2004)). Rule 1006 evidence "must be an objectively accurate summarization of the underlying documents, not a skewed selection of *some* of the documents to further the proponent's theory of the case." *Id.* at 311.

Rule 611(a), by contrast, permits a district court to allow a jury to view "pedagogical" charts and summaries "to aid the jury in its understanding of the evidence that has already been admitted."[4] *Janati*, 374 F.3d at 273. These illustrative aids are not evidence themselves but "facilitate the presentation and comprehension of evidence already in the record." *Id.* Illustrative aids "may include witnesses' conclusions or

---

[4] After the trial in this case, the Supreme Court adopted Federal Rule of Evidence 107, which now governs illustrative aids like these.

opinions, or they may reveal inferences drawn in a way that would assist the jury," subject to the district court's supervision and other rules of evidence. *Id.*

Mhana contends that the district court abused its discretion in admitting exhibits 900, 901A, 905–908, and 920 pursuant to Rule 1006.[5] We will first describe each exhibit, but because Mhana advances particularized arguments about only exhibits 900 and 905–908, we too will focus on those.

Exhibit 900, titled "IMEIs Sold by Protocol and Wireless City," is a 189-page summary of 61 other exhibits the district court admitted during trial. Sixty of those exhibits are sales invoices from Protocol and Wireless City Fashion (exhibits 101–160), and the other is a DHL spreadsheet identifying the devices found when a Protocol shipment ruptured (exhibit 650). Exhibit 900 lists 8,470 IMEIs and, for each one, identifies whether the sales invoice was from Protocol or Wireless City Fashion, the date of the invoice, and the admitted exhibit where that invoice can be found.

Exhibit 901A summarizes one data point from the wireless carrier spreadsheets admitted as exhibits 14A, 27A, 27B, 27C, and 28. For each wireless carrier, exhibit 901A calculates how many of the approximately 10,020 IMEIs for devices bought or sold by Protocol and Wireless City Fashion that carrier was able to confirm that it originally sold.

---

[5] Mhana also includes exhibits 916–918 in this list, but the district court ultimately did not admit those exhibits into evidence under Rule 1006. The district court initially admitted those exhibits under Rule 1006, but after Mhana renewed his objection, the court ruled that it would not send the exhibits back with the jury and, after the Government withdrew the exhibits, the court allowed the Government to use them as Rule 611(a) illustrative aids instead. Mhana does not argue that the district court's initial ruling prejudiced him or that these exhibits were improper under Rule 611(a).

16

Using those figures, exhibit 901A also calculates the percentage of IMEIs that were identified by their original sellers.

Exhibits 905–908 each summarize information about the devices found in one of four specific shipments from Protocol to a company overseas, corresponding with the four counts for transportation of stolen goods. While other admitted exhibits listed the devices in each shipment, exhibits 905–908 each present a table showing four data points about those devices, taken from the wireless carrier spreadsheets already admitted into evidence: IMEI, carrier, carrier determination (for example, "fraud," "nonpayment," "lost/stolen," and so forth), and loss amount. Each exhibit also calculates a total loss for the shipment.

Exhibit 920 summarizes cash withdrawals from Mhana's business bank accounts. The district court admitted into evidence more than 90 monthly bank statements and cash withdrawal slips related to those accounts. This exhibit lists each withdrawal, providing the account, date, and amount of cash withdrawn for each. It also calculates the total amount of cash withdrawn.

Mhana primarily argues that the challenged exhibits "were skewed and unduly 'selectiv[e]' because they 'did not fully represent the [materials] that they were purportedly summarizing.'" Opening Br. 43 (quoting *Oloyede*, 933 F.3d at 310). His argument is two-fold.

Initially, Mhana asserts that the Government's selection and presentation of some data points from the underlying documents, to the exclusion of other data points in those documents, makes the summary exhibits inaccurate and inadmissible under Rule 1006. Although Rule 1006 forbids "a skewed selection" of only "*some* of the documents"

17

purportedly summarized, it does not require a summary to include every data point within a set of voluminous records. *Oloyede*, 933 F.3d at 311. In *Oloyede*, we held that charts "purportedly summarizing" bank accounts failed to comport with Rule 1006 because the charts included only "selected deposits that had been made into the bank accounts consistent with the government's theory of which deposits were tied to illegal activity." *Id.* at 310. Specifically, the charts "included wire transfers only to the extent that the bank statement identified the name of the sender and that name was on a list [of suspected victims]" and similarly "included check deposits only to the extent that the check was written by an individual on the list." *Id.* Thus, the charts "did not fully represent the accounts that they were purportedly summarizing" because they included some, but not all, wire transfers and check deposits. *Id.*

*Oloyede* required that if some deposits appeared in the summary then every deposit should appear in the summary, not that every detail from the underlying documents be included. Here, for example, exhibit 900 purports to summarize the IMEIs sold by Mhana's business as reflected in 61 underlying documents. If exhibit 900 omitted some of those sales from its summary, it would fail to comport with Rule 1006. But admitting exhibit 900 did not exceed the district court's discretion merely because the exhibit includes four data points for each sale—IMEI, business, date, and exhibit number—without including other data points for those sales that also are reflected in the underlying documents, like the device color and storage capacity.

Next, Mhana argues that some exhibits were improperly admitted under Rule 1006 because, just like *Oloyede*, they selectively summarized certain transactions within the

18

underlying documents and omitted others to help the jury understand how various related records supported the Government's case. In this regard, Mhana highlights exhibits 905–908, which marry device lists from four shipments with information about those devices lifted from larger documents describing many more devices.[6] At oral argument, he also represented that exhibit 900 does not include all of the sales reflected in exhibit 102, which is one of the sixty sets of invoices underlying exhibit 900. The Government responded that exhibit 900 focuses on overseas sales because those were most likely to involve criminal activity. The parties have not provided us with exhibit 102.

Even assuming the district court erred in admitting exhibits 900 and 905–908 under Rule 1006, we find the error harmless for three reasons. First, all of the underlying documents for these summary exhibits were already in evidence. The jury therefore had access to all of the information provided in the summary exhibits, which organized, but did not add to, the corpus of evidence at trial.

Second, each of these disputed exhibits could have been shown to the jury as illustrative aids pursuant to Rule 611(a). *See Oloyede*, 933 F.3d at 311 ("[W]e are confident that the error did not affect the defendants' substantial rights, particularly as the same information in the same form could have been shown to the jury under Rule 611(a)."). And

---

[6] Mhana also contends that exhibits 905–908 impermissibly contained trial testimony because the Government highlighted accounts that were opened in the name of victims who testified at trial. At Mhana's request, however, the district court ordered the Government to remove the highlighting and victim identifications from the exhibits before they were sent back with the jury. Although the jury saw the highlighting and identifications in court before they were removed, the Government could have shown the jury the same editorial markup of those exhibits during closing argument.

Mhana was "free to cross-examine the government's witnesses" about these exhibits, "just as if the charts had been shown to the jury under Rule 611(a)." *Id.* Mhana notes that the district court did not instruct the jury that they were prohibited from considering these exhibits as substantive evidence. *See Janati*, 374 F.3d at 273 ("Whenever pedagogical charts are employed . . . the court should make clear to the jury that the charts are not evidence themselves, but are displayed to assist the jury's understanding of the evidence."). But that does not preclude a finding of harmlessness here, just as it did not in *Oloyede. See* 933 F.3d at 311. Particularly in a case, like this one, where the underlying records were admitted into evidence and available to the jury, the absence of a limiting instruction does not undermine the conclusion that the jury's verdict was not substantially swayed by admission of the summary exhibits.

Third, the jury heard overwhelming evidence of Mhana's guilt, including testimony from coconspirators, victims, investigators, and wireless company representatives. *See United States v. Caldwell*, 7 F.4th 191, 204 (4th Cir. 2021) (calling "the closeness of the case" and "the centrality of the issue affected by the error" "decisive factors" in harmless error review (internal quotation marks omitted)). After reviewing the evidence, we find it "highly probable" that the admission of exhibits 900 and 905–908 "did not affect the [jury's] judgment" that Mhana, with guilty knowledge, committed these crimes. *Id.* (internal quotation marks omitted).

## D.

In a final attempt at reversal, Mhana reminds us that "[t]he cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same

20

extent as a single reversible error." *United States v. Basham*, 561 F.3d 302, 330 (4th Cir. 2009) (internal quotation marks omitted). "To satisfy this requirement, such errors must so fatally infect the trial that they violated the trial's fundamental fairness." *Id.* (internal quotation marks omitted). "Generally, however, if a court determine[s] . . . that none of [a defendant's] claims warrant reversal individually, it will decline to employ the unusual remedy of reversing for cumulative error." *Id.* (internal quotation marks omitted).

Although we have assumed the existence of "a few harmless errors, they were not widespread or prejudicial enough to have fatally infected [Mhana's] trial." *United States v. Lighty*, 616 F.3d 321, 371 (4th Cir. 2010). Indeed, as explained above, we doubt whether any of the evidentiary errors we have assumed had any effect at all. *See Basham*, 561 F.3d at 330 ("When none of the individual rulings work any cognizable harm, it necessarily follows that the cumulative error doctrine finds no foothold." *Id.* (internal quotation marks, brackets, and ellipsis omitted)). We easily conclude, therefore, that any evidentiary errors, even considered cumulatively, did not play a role in the outcome of Mhana's trial, which "adhered to fundamental fairness." *Lighty*, 616 F.3d at 371. And "[i]t is well-settled that a criminal defendant is entitled to a fair trial not a perfect one." *United States v. Runyon*, 707 F.3d 475, 520 (4th Cir. 2013) (internal quotation marks omitted).

## III.

We turn now to the Government's cross-appeal of the district court's ruling denying a forfeiture judgment. We review the district court's interpretation of federal forfeiture laws de novo and its factual findings for clear error. *United States v. Morgan*, 224 F.3d 339, 342 (4th Cir. 2000).

21

"If a person is charged in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized, the Government may include notice of the forfeiture in the indictment or information pursuant to the Federal Rules of Criminal Procedure." 28 U.S.C. § 2461(c). "If the defendant is convicted of the offense giving rise to the forfeiture, the court *shall* order the forfeiture of the property as part of the sentence in the criminal case." *Id.* (emphasis added). "The word 'shall' does not convey discretion." *United States v. Blackman*, 746 F.3d 137, 143 (4th Cir. 2014) (internal quotation marks omitted). Indeed, "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where [Section 2461] applied." *Id.* (internal quotation marks omitted). "The plain text of the statute thus indicates that forfeiture is not a discretionary element of sentencing" but rather "[Section] 2461 mandates that forfeiture be imposed when the relevant prerequisites are satisfied." *Id.*

Those prerequisites are satisfied here. First, forfeiture was authorized because Mhana was charged with transportation of stolen goods in violation of 18 U.S.C. § 2314. "Any property . . . which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title)" is "subject to forfeiture to the United States." 18 U.S.C. § 981(a)(1)(C). Section 1956(c)(7) defines "specified unlawful activity" to include, with exceptions not relevant here, "any act . . . constituting an offense listed in section 1961(1) of this title." 18 U.S.C. § 1956(c)(7). And Section 1961(1) lists "any act which is indictable under . . . title 18,

22

United States Code, . . . section[] 2314 . . . (relating to interstate transportation of stolen property)." 18 U.S.C. § 1961(1).

Second, the Government "include[d] notice of the forfeiture in the indictment." 28 U.S.C. § 2461(c); *see* Fed. R. Crim. P. 32.2(a) ("A court must not enter a judgment of forfeiture in a criminal proceeding unless the indictment or information contains notice to the defendant that the government will seek the forfeiture of property as part of any sentence in accordance with the applicable statute."). The Government was not required to identify in the indictment "the property subject to forfeiture or specify the amount of any forfeiture money judgment" sought. Fed. R. Crim. P. 32.2(a).

Third, Mhana was convicted of transportation of stolen goods in violation of 18 U.S.C. § 2314, the "offense giving rise to the forfeiture." 28 U.S.C. § 2461(c). Moreover, the jury returned a special verdict form finding a nexus between specific property and Mhana's offense. *See* Fed. R. Crim. P. 32.2(b)(5)(B). And the district court entered a preliminary order of forfeiture for that specific property, for certain substitute property, and for a $3,649,033 money judgment determined by the court. *See* Fed. R. Crim. P. 32.2(b)(1)(A) ("If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay."); *see also United States v. Jameel*, 626 Fed. App. 415, 419 (4th Cir. 2015) (finding "without merit" a defendant's claim that he "was entitled to a jury trial to determine the amount of the money judgment").

The district court declined to order forfeiture at sentencing out of concern about "double payment" of restitution and forfeiture. J.A. 1911; *see also* J.A. 1909 (district court

23

noting that "there's only so much blood in the turnip"). But we have made clear that "[f]orfeiture is mandatory even when restitution is also imposed." *Blackman*, 746 F.3d at 143. And "[t]he fact that a defendant . . . lacks adequate assets to satisfy a judgment does not operate to frustrate entry of a forfeiture order." *Id.* at 143–144. "Insofar as the district court believed that it could withhold forfeiture on the basis of equitable considerations," therefore, "its reasoning was in error." *Id.* at 143.

Mhana calls to our attention one sentence from the sentencing hearing in which he asserted that the money judgment in the preliminary order of forfeiture was "an excessive fine that would violate the Eighth Amendment" and "a fine in excess of the statutory maximum." J.A. 1909. The district court did not base its ruling on either of those grounds. On appeal, Mhana presents no substantive argument that entry of a forfeiture order would have violated the Eighth Amendment or exceeded the statutory maximum penalties for his offenses; he relies entirely on the incorrect implication that the district court adopted his one-line assertion at sentencing. In any event, Congress has placed "no statutory . . . maximum limit on forfeitures." *United States v. Alamoudi*, 452 F.3d 310, 314 (4th Cir. 2006). And having failed to engage, either below or on appeal, with any of the factors that guide this Court's "determination of whether a forfeiture is 'grossly disproportional'" in violation of the Eighth Amendment, Mhana certainly has not "carr[ied his] burden of demonstrating gross disproportionality." *United States v. Sanders*, 107 F.4th 223, 232 (4th Cir. 2024).

The district court erred in declining to enter a forfeiture judgment, and that error warrants reversal.

24

IV.

For the foregoing reasons, we affirm Mhana's convictions, reverse the district court's forfeiture ruling, and remand with directions for the court to enter a forfeiture judgment.

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED*